Filed 12/15/14

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D063793 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD214650) |
| MICHAEL BARAKA MASON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, David M. Gill, Judge. Reversed in part and affirmed in part as modified.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Arlene Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I and II.

A jury convicted Michael Baraka Mason of three counts of first degree murder (Pen. Code, § 187, subd. (a))[1] and found true the special circumstances of robbery-murder (§ 190.2, subd. (a)(17)) and multiple murders (§ 190.2, subd. (a)(3)) as to each. The jury further convicted Mason of one count of attempted murder (§§ 187, subd. (a), 664); two counts of attempted robbery (§§ 211, 664); one count of burglary (§ 459); five counts of false imprisonment by violence (§§ 236, 237, sub. (a)); one count of assault with a firearm (§ 245, subd. (a)(2)); two counts of shooting at an inhabited dwelling (§ 246); and four counts of possession of a firearm by a felon (former § 12021, subd. (a)(1)). The jury also found true several gang and firearms-related sentencing enhancements. (§§ 186.22, subd. (b)(1), 12022.53, subd. (d).) Mason admitted suffering two prior serious felony convictions under section 667, subdivision (a)(1), and three "strike priors" for purposes of section 667, subdivisions (b) through (i).

Following a penalty phase trial, the jury fixed the penalty for one of the murder counts as life imprisonment without the possibility of parole. The jury was unable to reach a verdict on the penalty for the other two murder counts, and the court declared a mistrial. The prosecution declined to retry the penalty phase as to those two counts.

The court sentenced Mason to nine consecutive terms of life imprisonment without the possibility of parole. The nine terms consist of one term for each count of murder, which were then tripled pursuant to the "Three Strikes" law. (§ 667, subd. (e)(2).) In addition, the court sentenced Mason to an indeterminate term of 337 years and six months to life imprisonment, plus an additional 110 years.

---

[1] Further statutory references are to the Penal Code unless otherwise specified.

Mason appeals, contending (1) the court erroneously admitted the prior testimony of one victim, Hana Jabbar, after finding her unavailable under Evidence Code section 240, subdivision (a)(4) and (5); (2) the court erroneously admitted the out-of-court statements of an informant, Marquis Veal, allegedly recounting statements made by Mason's accomplice, Terrill Bell, which the court found were statements against interest under Evidence Code section 1230; (3) the evidence does not support Mason's multiple convictions for possession of the same firearm, on different days, because that crime is a single, continuous offense; and (4) the sentences of life imprisonment without parole should not have been tripled pursuant to the Three Strikes law.

In the unpublished portions of this opinion, we conclude Hana Jabbar's testimony was properly admitted and any error in admitting Marquis Veal's statements was harmless. However, we agree the evidence does not support multiple convictions for firearm possession based on Mason's possession of the same gun on different days. We also agree that the Three Strikes law does not provide for tripling sentences of life imprisonment without the possibility of parole. We discuss the latter two issues in the published portions of this opinion below. In light of our conclusion, we therefore reverse three of Mason's four convictions for firearm possession and modify the judgment to reflect a single life sentence without parole for each first degree murder conviction. In all other respects, the judgment as modified is affirmed.

## FACTS

Mason, also known as "Don Diego," is a documented member of the Lincoln Park criminal street gang. Lincoln Park's members have been found responsible for murders

and other criminal acts. Mason is an older, more established member of the gang, known as an "original gangster" or "OG." Other established or OG members of Lincoln Park included Tamoyia Morris, Terrill Bell, and Elliott Perry. In statements to law enforcement, Mason described Morris and Bell as his close friends.

In a gang like Lincoln Park, younger members of the gang are often expected to support older members like Mason. One younger member of Lincoln Park was Z.Z. Jabbar.[2] Z.Z. was a successful drug dealer. He was known for flaunting his wealth, which is called "flossing." Morris, as an established member of Lincoln Park, offered to protect Z.Z. in exchange for part of Z.Z.'s drug revenues. After Z.Z. did not accept Morris's offer, Morris severed his relationship with Z.Z.

Z.Z.'s sister, Hana, lived in a house on Velma Terrace in San Diego. The house was located within the geographic territory of the Lincoln Park gang. Hana's ex-husband purchased the house for her. Police observed Z.Z. coming and going from the house.

At the house, Hana had hoped to run an assisted living home for individuals with mental illnesses. Hana was unable to move the project forward, however, and she found roommates instead. One roommate was Sascha Newbern. Newbern was romantically involved with Meico McGhee, who was Z.Z.'s and Hana's brother. McGhee was also

---

[2] We will refer to Z.Z. Jabbar and his sister Hana Jabbar by their first names to avoid confusion.

4

Newbern's pimp. McGhee came to the house often, though he did not live there. Preston and Stacey Adams also lived with Hana and Newbern at the Velma Terrace house.[3]

On November 25, 2005, the day after Thanksgiving, Hana and Preston woke up early and went to work. Sometime afterwards, Stacey awoke to the sound of strange men in the house. When she opened her bedroom door, a man appeared wearing a ski mask and holding a gun. The man tied Stacey's hands and feet, blindfolded her, and asked her where "the money" was. Before she was blindfolded, Stacey observed Newbern tied up as well. At least two men were in the house, and they were speaking via walkie-talkies to at least one other man outside. They were discussing "the money" and using Hana's name.

Preston arrived home in the early afternoon. He was confronted at the front door by a man with a gun and a bandana or ski mask over his face. Preston was blindfolded, and his hands were tied behind his back. He was led to the room where Stacey was tied up. The men brought Newbern into the room as well. Newbern was crying hysterically. The men threatened to kill her if she did not quiet down.

The men were looking for $500,000, which they believed to be in the house. The men asked Preston and Stacey where the money was; Preston and Stacey were not aware of any money. The men used words typical of Crips criminal street gangs, but Preston and Stacey believed they were trying to hide the fact that they were actually Bloods. At

---

[3]    We will refer to Preston and Stacey Adams by their first names, as well, to avoid confusion.

one point, they heard the men slip up and use words commonly associated with Bloods rather than Crips. Lincoln Park is a Bloods gang.

McGhee arrived at the house next. After he arrived, he fought with the men. They beat McGhee savagely and demanded to know where the money was. McGhee said he did not know what they were talking about. After the beating, McGhee's breathing was labored. The men threw McGhee into a bathtub in Preston and Stacey's bathroom.

When Hana came home, one of the men met her soon after she entered the doorway. The man was holding a gun and wearing a mask. Hana later identified this man as Mason after seeing Mason's photograph on the internet.

The men bound Hana's hands and feet. The men told Hana they knew her brother Z.Z. had hidden money in the house. (Z.Z. was incarcerated at that point.) The men threatened to kill her, or hurt the others, if she did not tell them where the money was. They poured gasoline on McGhee and threatened to set him on fire. Hana did not know about any money, but she told them to look in the backyard and in a safe to distract them.

Having failed to find the money, the men told Newbern to get into the bathtub with McGhee. They turned up the television volume very loud. There was at least one gunshot. One of the men said to another that he had to "put in work" too. Then at least one other shot was fired. The men fled. Stacey, Preston, and Hana ran from the house and called for help.

Police arrived and found the house ransacked. They discovered McGhee and Newbern bound and gagged in the bathtub. McGhee had suffered two gunshot wounds to the head, one of which had passed through his brain. McGhee also had numerous bruises

6

and lacerations on his head and chemical burns on his body. The chemical burns could have been caused by exposure to gasoline. Newbern suffered a single gunshot wound to the head. She also had chemical burns on her buttocks. Both victims' gunshot wounds were fatal. Three bullet casings were found at the scene. Forensic analysis revealed that they were likely fired from the same gun.

In the bathroom, police found three cigarette butts, a tampon, and a piece of wax paper in a toilet. Police observed urine in the toilet, which Preston had flushed before he went to work that day. DNA analysis of the cigarette butts revealed that one matched Newbern's DNA. Another cigarette butt matched Mason's DNA. The probability that a random man in the African-American population would match the DNA found on that cigarette butt is 1 in 2.1 sextillion individuals. (Mason is African-American.) The cigarettes appeared to have been deposited in the toilet around the same time. Police also found a blood stain on the bathroom door. Later analysis of the stain revealed that it contained a mixture of DNA from McGhee and DNA from Tamoyia Morris.

Although they did not have Hana's witness identification or the DNA analysis identifying Mason at the time, police suspected that Mason was involved in the shootings. Mason's photograph was posted on a Crime Stoppers Web site, and he was identified twice on the television show "America's Most Wanted." Later, Marquis Veal, a Lincoln Park gang member, told police about a conversation he had with Terrill Bell. In

7

that conversation, Bell admitted taking part in the Velma Terrace shootings and said that Mason, Morris, and Perry were involved as well.[4]

Twenty months after the Velma Terrace shootings, Nagar Safavi and Timothy Traaen were out celebrating their anniversary in the area of Adams Avenue and 30th Street in San Diego. They parked on Suncrest Drive and went to a nearby bar to meet friends. They left the bar around midnight and walked to their car. Traaen opened the car door. As they talked, a man approached and pointed a gun at them. He demanded money. Traaen tried to reason with the man, but after a few minutes Safavi emptied the contents of her purse on the car seat. The man grabbed some items and then fired several shots at Safavi and Traaen.

Traaen was struck three times and died from his wounds. Safavi suffered a gunshot wound to her chest, but she survived. Safavi described the shooter as an African-American male with a flat nose and full lips. He was wearing a hooded sweatshirt that partially covered his face. While viewing a lineup that included Mason, Safavi could not identify the shooter.

Witnesses observed a man with a gun running down an alleyway, where an older full-sized Chevy van was parked. One witness heard both a male and female voice. The man told the woman to "[h]urry up, get in the van." The van drove away, in reverse, with its lights off. In the alleyway, police investigators recovered a cigarette butt in very good

---

4    At trial, Veal denied any knowledge of the shootings. He claimed that police detectives had told him what to say. Veal testified that he was distraught over his grandmother's death and wanted to attend her funeral. After Veal discussed the Velma Terrace shootings with police, they transported him from jail to attend the funeral.

condition. DNA recovered from the cigarette butt matched the DNA of a woman named Jessica Jones.

Jones had purchased an older, full-sized Chevy van the month before in Las Vegas, Nevada. Jones was accompanied by a muscular African-American man with a tattooed arm. Witnesses identified it as the same van leaving the alleyway near Suncrest Drive.

Three weeks after the Suncrest shootings, witnesses observed a similar van involved in a drive-by shooting on Capistrano Avenue in Spring Valley, an unincorporated area in San Diego County. An African-American man in the van fired shots at several other African-American men who were gathered near the street. The men returned fire. A bullet was recovered from a nearby house where Perry lived with his family. The bullet was fired from the same gun that was used in the Suncrest shootings. Other bullets, fired from another gun, were recovered in the area.

A witness identified one of the men near the street as Tamoyia Morris. Earlier, Morris's mother had contacted police and reported that Morris had been threatened by Mason, whom she identified as "Lon Don." Mason left a note on Morris's car threatening to kill him for being a "snitch." Morris's mother spoke to police a week later to report that Morris had received threatening voice mail messages from Mason. In the messages, Mason demanded money because he was on the run from police.

The next day, police responded to a report that shots had been fired at Morris's house as well. Morris and his grandmother, who also lived there, denied that any shots

had been fired recently.[5]  However, police reinvestigated the shooting almost a year later and found three bullets in the stucco walls of the house, which was located on Keeler Street.  These bullets were fired from the same gun that was used in the Suncrest and Capistrano shootings.

Later, Jessica Jones was contacted by police investigating a potential domestic disturbance at the Padre Gardens apartment complex in San Diego.  Police received a report of an argument between a male and a female there.  Police knocked on the door of the apartment, but there was no answer.  Police noticed the van Jones had purchased parked outside the apartment.  It took police several minutes to get a key from the apartment management.  When police entered the apartment, they spoke with Jones.  They did not find any other person in the apartment.  In a later interview with law enforcement, Mason admitted staying at the apartment with Jones.  He said he hid underneath a pile of clothes when the police arrived.

Other members of law enforcement continued to search for Mason, who also had an outstanding warrant for parole violations.  One night, in the hopes of finding Mason, police surveilled a parking lot at a shopping center in the College Grove area of San Diego.  They identified a dark green Nissan Altima, which met a white sport utility vehicle in the lot.[6]  The Nissan exited the parking lot, and police followed.  At one point,

---

[5]     During his conversation with police, Morris identified himself as "Tamoyia Johnson."

[6]     The owner of a recording studio in San Diego testified he went to the lot that night, but he could not remember whom he met there.  He was delivering a studio recording of music produced by Mason (under the name "Don Diego").

a police detective in an unmarked car found himself in front of the Nissan. The Nissan pulled up alongside the police car, and the police detective believed the Nissan's passenger looked very similar to Mason. The detective and other marked patrol cars followed the Nissan. The Nissan drove to an apartment complex and crashed into a building. The individuals in the car fled. The police detective followed the passenger who looked similar to Mason, but he escaped through nearby woods. In the woods, along the passenger's path, police found a gun that appeared to have been freshly dropped there.

Forensic analysis revealed that the gun police recovered had been used in the Suncrest shootings which killed Traaen and injured Safavi, as well as the drive-by shootings at Capistrano and Keeler. Analysis of DNA found on the gun revealed a mixture of DNA from at least two individuals. Mason was very likely a contributor to the DNA mixture found on the gun. Mason's DNA types were the strongest of the types in the mixture.

Mason contacted an acquaintance, Veronica Patton, and asked her to help him buy two vehicles, one of which was for Jones. Patton also assisted Mason in renting a house in Las Vegas for him and Jones. In Las Vegas, Mason was stopped for a routine traffic violation. After stopping, Mason sped away from police. The police gave chase, but they had to fall back because Mason's driving was creating a dangerous situation. The police, assisted by a helicopter, tracked Mason's position. Mason and a passenger eventually fled on foot. An officer, also on foot, caught up with Mason in a Las Vegas backyard. As the officer tried to apprehend him, Mason swung a pipe at the officer. After a struggle with two officers, during which Mason was hit with a Taser several

11

times, Mason was taken into custody. The passenger, a 17-year-old female, was found in a nearby pizza restaurant and arrested as well. While in custody, Mason gave a false name to Las Vegas police.

In their subsequent investigation, Jones led police to the Chevy van, which was at an abandoned car upholstery shop. Police identified a bullet hole on the inside of the van. Police recovered a bullet, which matched the unidentified bullets recovered from the scene of the Capistrano drive-by shooting. The bullets appeared to have been fired by one of the targets of the shooting.

Police uncovered a number of letters and other documents written by Mason. One letter chides Jones for speaking with police. It asked her, "What happen[ed] to you just sayin[g] I want my lawyer!!?" Another letter expressed dismay that police had recovered the van "in the condition it was left in!!" A document recovered from Mason's jail cell appeared to contain rap lyrics about a home invasion robbery stemming from a gang member's failure to support other members of the gang.

At trial, Mason's defense disputed the various eyewitness identifications as unreliable and contradictory. It also attacked the credibility of the statements Marquis Veal made to police. A Lincoln park member, Desavian Powell, testified that Mason was a well-respected musical artist and the member of a rap group called the "Cherry Chuck Gang." The Cherry Chuck Gang wanted to fix up the Chevy van and use it for their tours. The owner of the car upholstery shop testified that Darryl Charles, another Lincoln Park member and a member of the Cherry Chuck Gang, brought the van in for upgrades. When the business failed, however, the owner left the van parked on his lot.

12

Powell said the van could be started without keys and numerous people drove it. Another defense witness, Tyrone Simmons, also a Lincoln Park member, testified that he lived in the Padre Gardens apartment and was romantically involved with Jessica Jones. He denied that Mason ever stayed at the apartment.

DISCUSSION

I

Hana did not testify live at trial. Instead, her preliminary hearing testimony was admitted as the prior testimony of an unavailable witness. (Evid. Code, § 1291.) To establish Hana's unavailability, the prosecution offered the testimony of William Cahill, an investigator employed by the prosecution. Cahill spent approximately 18 years as a detective with the San Diego Police Department. Outside the presence of the jury, Cahill testified that he had been in contact with Hana prior to the trial of Tamoyia Morris, who was also charged in connection with the Velma Terrace shootings. Hana was very cooperative until just prior to the start of Morris's trial. Cahill continued to try to contact her, but he was unable to do so. Cahill's efforts included calls, e-mails, and text messages to Hana; discussions with Hana's ex-husband and boyfriend; and visits to places where Hana had lived. Cahill also placed Hana's name in an "Officer Notification System." Cahill was unable to reach her.

Hana contacted Cahill after Morris's trial to ask about the outcome. Cahill spoke with Hana and told her he would need to subpoena her for Mason's trial, which was upcoming. Hana said she would be in contact with Cahill. When she was not, Cahill tried to contact Hana again. He used the same methods he had used before. Cahill texted

13

or e-mailed Hana, but he received no response. Cahill spoke with Hana's ex-husband, but he said Hana was living on the streets in the East Village area of downtown San Diego. Cahill drove through that area several times, spoke with homeless people there, and showed them Hana's picture. Cahill also spoke with Z.Z. and Hana's now-former boyfriend. Cahill reviewed a police database that would list any contacts Hana had with police or emergency personnel, but there were no results. On cross-examination, Cahill was asked whether he had attempted to triangulate Hana's location through her cell phone. Cahill replied he had not.

Based on Cahill's testimony, the trial court found that Hana was unavailable as a witness within the meaning of Evidence Code section 240, subdivision (a)(4) and (5). The court stated, "I think under either one or both of those provisions, the preponderance of the evidence establishes her unavailability, which satisfies that foundational requirement for the use of her prior testimony."

Mason contends the court erred in finding Hana unavailable. Evidence Code section 240, subdivision (a)(4), provides that a witness is unavailable when he or she is "[a]bsent from the hearing and the court is unable to compel his or her attendance by its process." The Attorney General does not argue that Hana was unavailable within the meaning of that subdivision. Instead, the Attorney General relies on Evidence Code section 240, subdivision (a)(5), which provides that a witness is unavailable when he or she is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." Mason counters that the prosecution did not exercise reasonable diligence in

14

securing Hana's attendance at his trial and thus cannot establish her unavailability under this subdivision.

"The term 'reasonable diligence' or 'due diligence' under Evidence Code section 240, subdivision (a)(5) ' "connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.  [Citations.]' "  [Citation.]  Considerations relevant to this inquiry include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored."  (*People v. Wilson* (2005) 36 Cal.4th 309, 341.)

" 'What constitutes due diligence to secure the presence of a witness depends upon the facts of the individual case.' "  " 'The totality of efforts of the proponent to achieve presence of the witness must be considered by the court.' "  (*People v. Sanders* (1995) 11 Cal.4th 475, 523.)  The proponent of an unavailable witness's testimony must undertake good faith efforts that are reasonable under the circumstances to obtain the witness's presence at trial.  (*People v. Herrera* (2010) 49 Cal.4th 613, 622-623 (*Herrera*).)

" 'That additional efforts might have been made or other lines of inquiry pursued does not affect [a] conclusion [there was due diligence] . . . .  It is enough that the People used reasonable efforts to locate the witness.' [Citation.]  A court cannot 'properly impose upon the People an obligation to keep "periodic tabs" on every material witness in a criminal case, for the administrative burdens of doing so would be prohibitive.  Moreover, it is unclear what effective and reasonable controls the People could impose upon a witness who plans to leave the state, or simply "disappear," long before a trial date is set.' "  (*People v. Diaz* (2002) 95 Cal.App.4th 695, 706.)

The proponent of the witness has the burden of showing the witness is unavailable. (*People v. Valencia* (2008) 43 Cal.4th 268, 292.) "We review the trial court's resolution of disputed factual issues under the deferential substantial evidence standard [citation], and independently review whether the facts demonstrate prosecutorial good faith and due diligence [citation]." (*Herrera, supra*, 49 Cal.4th at p. 623.)

Here, the facts surrounding the prosecution's efforts to secure Hana's attendance at trial are essentially undisputed. Cahill, the prosecution's investigator, spoke with Hana prior to Mason's trial and told her her testimony would be required. Later, Cahill attempted to contact Hana by cell phone, but she did not respond. Cahill spoke with the people closest to Hana about her whereabouts and determined she was homeless. Cahill went to the area where she was reportedly staying and showed her picture to other homeless people in an effort to find her. Cahill himself drove through the area multiple times looking for her. Cahill also reviewed a database of contacts with law enforcement and emergency personnel and found no mention of Hana.

Although Hana's eyewitness testimony and identification of Mason were important evidence at Mason's trial, we conclude the prosecution's efforts to secure her attendance were reasonable under the circumstances. (See *People v. Sanders, supra*, 11 Cal.4th at p. 523.) Based on Cahill's investigation, even Hana's closest friends were not in contact with her and did not know her location.[7] Cahill nonetheless determined the area of San Diego in which she was believed to be living. With that information, Cahill undertook

---

[7] Mason argues that the police should have put Hana's former boyfriend under surveillance. We disagree. Under the circumstances, it is reasonable to believe that such surveillance would have been a waste of resources.

substantial efforts to try to find her. Mason suggests that Cahill could have visited homeless shelters and spoken to aid agencies in the area about Hana. While those actions may have been helpful, it was not unreasonable for the prosecution to rely on Cahill's direct contact with homeless people and his own search of the streets in the area.

Mason points out that Hana failed to appear at the earlier Morris trial. He contends the prosecution should have secured a material witness warrant for her arrest. (See § 1332.) After Morris's trial, however, Hana reached out to Cahill to inquire about the results. When Cahill told her she would have to testify at Mason's trial, she did not explicitly resist. Hana said she would contact Cahill when the trial was closer, and Cahill continued to have her cell phone contact information. Under these circumstances, the prosecution's failure to obtain a material witness warrant was not unreasonable. "To have a material witness who has committed no crime taken into custody, for the sole purpose of ensuring the witness's appearance at a trial, is a measure so drastic that it should be used sparingly." (*People v. Cogswell* (2010) 48 Cal.4th 467, 477.) Mason has not shown that such a drastic measure was required here.

Mason also suggests that the prosecution was required to use Hana's cell phone to locate her, either through billing records or electronic tracking. Since Hana was homeless, however, her billing records would not have reflected her residence. While some evidence of her location may have been obtained from her payment information, or through electronic tracking, the prosecution was not required to undertake every possible

17

effort to locate Hana.[8]  The prosecution's actions show good faith and reasonable efforts under the circumstances here.  (See *Herrera, supra*, 49 Cal.4th at pp. 622-623.)  " 'That additional efforts might have been made or other lines of inquiry pursued does not affect this conclusion.  [Citation.]  It is enough that the People used reasonable efforts to locate the witness.' "  (*People v. Wilson, supra,* 36 Cal.4th at p. 343.)

We conclude the trial court did not err in finding Hana unavailable under Evidence Code section 240, subdivision (a)(5), and admitting her preliminary hearing testimony.  Because the trial court did not err, we need not consider Mason's arguments regarding prejudice.

## II

The trial court admitted a video recording of Marquis Veal's statements to police detectives about the Velma Terrace shootings.  In the video, Veal identifies Mason, along with Bell, Morris, and Perry, as taking part in the shootings.  One of the detectives, Scott Barnes, testified that Veal identified Bell as the source of Veal's information about the Velma Terrace shootings.[9]  The trial court reasoned that Bell's statements to Veal, while hearsay, were admissible as statements against Bell's penal interest.  (See Evid. Code, § 1230.)

---

[8]     We note that Mason's discussion of the possibility of electronic tracking relies largely on speculation and unsupported assertions regarding the technical feasibility and legality of the procedure.

[9]     The defense offered testimony from another police detective who interviewed Veal the day after Barnes.  That detective testified that Veal told him that Bell had named only himself as a participant.  Veal heard the others were involved only through rumors.

Evidence Code section 1230 provides as follows: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

"[I]n order to qualify for admission [under this hearsay exception], '[t]he proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.' " (*People v. Brown* (2003) 31 Cal.4th 518, 535.)

This exception is limited to statements that are specifically disserving of the declarant's penal interests; collateral assertions do not qualify. (*People v. Duarte* (2000) 24 Cal.4th 603, 612.) "In order to ' "protect defendants from statements of unreasonable men if there is to be no opportunity for cross-examination," ' we have declared section 1230's exception to the hearsay rule 'inapplicable to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant.' " (*Ibid.*)

" 'The focus of the declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration. [Citations.] In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is

19

sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' " (*People v. Geier* (2007) 41 Cal.4th 555, 584; see *People v. Greenberger* (1997) 58 Cal.App.4th 298, 335 ["The trial court must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry."].)  "We review a trial court's decision as to whether a statement is against a defendant's penal interest for abuse of discretion." (*People v. Lawley* (2002) 27 Cal.4th 102, 153.)

Mason challenges the admission of those portions of Bell's statement (as repeated by Veal) that name Mason as a participant in the Velma Terrace shootings.  "When examining what was actually said by the declarant special attention must be paid to any statements that tend to inculpate the nondeclarant.  This is so because a statement's content is most reliable in that portion which inculpates the declarant.  It is least reliable in that portion which shifts responsibility.  Controversy necessarily arises when the declarant makes statements which are self-inculpatory as well as inculpatory of another.  This is why Evidence Code section 1230 only permits an exception to the hearsay rule for statements that are specifically disserving of the declarant's penal interest.  [Citation.]  This is not to say that a statement that incriminates the declarant and also inculpates the nondeclarant cannot be specifically disserving of the declarant's penal interest.  Such a determination necessarily depends upon a careful analysis of what was said and the

20

totality of the circumstances."  (*People v. Greenberger, supra*, 58 Cal.App.4th at p. 335; see *People v. Lawley, supra*, 27 Cal.4th at p. 154.)

The exact statement that Bell made to Veal is not part of the record.  Veal's description of Bell's statement is, at best, unclear.  Although Bell and Veal are friends and fellow gang members, the circumstances and context of Bell's statements to Veal are largely unknown.  However, even assuming the trial court erred in admitting Veal's statements implicating Mason, we conclude any such error was harmless.

The parties agree that we review the prejudicial effect of this error under *People v. Watson* (1956) 46 Cal.2d 818, 836.  (See *People v. Samuels* (2005) 36 Cal.4th 96, 121; see also *People v. Duarte, supra*, 24 Cal.4th at p. 619.)  Under this standard, we must determine whether it is reasonably probable that Mason would have obtained a more favorable verdict if the court had excluded Veal's statements.  (See *People v. Watson, supra*, 46 Cal.2d at p. 836; see also *People v. Garcia* (2008) 168 Cal.App.4th 261, 292.)  Here, Veal's statements were the weakest of the evidence directly tying Mason to the Velma Terrace shootings.  The source of Veal's information, Bell, was Mason's accomplice.  At trial, Veal claimed he lied to the detectives and told them only what they wanted him to say.  Another police detective, who interviewed Veal a day later, testified that Veal told him that he heard Mason was involved only through rumors.  After Veal's interview with the detectives, police let him out of jail temporarily to attend his grandmother's funeral.

By contrast, other evidence tying Mason to the Velma Terrace shootings was quite strong:  Hana identified Mason as one of the perpetrators, and Mason's DNA was found

21

on a freshly-dropped cigarette in the bathroom where Newbern and McGhee's bodies were found. Mason's participation in the Velma Terrace shootings was also consistent with his position in the Lincoln Park gang and his close friendship with Morris, whose DNA was also found at the scene and whose relationship with Z.Z. was severed over Z.Z.'s failure to share the revenue from his drug distribution. Given this evidence, we do not find it reasonably probable that Mason would have achieved a more favorable result if Veal's statements had been excluded.[10]

### III

Mason was convicted of four counts of possession of a firearm by a felon. (Former § 12021, subd. (a)(1).)[11] Each count specified a date of possession, corresponding to the dates of the Suncrest shootings, the Capistrano drive-by shooting, the Keeler drive-by shooting, and the police chase that led to the recovery of the firearm used in each. The prosecution's theory was that Mason possessed the same firearm on each of the specified dates.

Mason contends that the evidence does not support four separate convictions for possession because his possession of the firearm was continuous throughout the period

[10] Mason relies on statements by one juror, after the guilt phase had ended, that she had reconsidered her verdict and potentially had reasonable doubt as to one or more of the charges against Mason. Consideration of the juror's statements appears to be barred by Evidence Code section 1150. (See *People v. Peavey* (1981) 126 Cal.App.3d 44, 50-51.) Moreover, we disagree that the juror's vague statements—which do not relate to Veal or the Velma Terrace shootings specifically—show that the admission of Veal's statements was prejudicial.

[11] As of January 1, 2012, former section 12021, subdivision (a)(1), was repealed and recodified without substantive change as section 29800, subdivision (a)(1). (Stats. 2010, ch. 711, § 6; see *People v. Correa* (2012) 54 Cal.4th 331, 334, fn. 1 (*Correa*).)

covered by the dates in question. Mason argues that the evidence supports only a single conviction for possession. The Attorney General disagrees, arguing that the possessions were distinct as to time and place, and accompanied by different objectives, such that they should constitute separate offenses.

Former section 12021, subdivision (a)(1) provided as follows: "Any person who has been convicted of a felony under the laws of the United States, the State of California, or any other state, government, or country or of an offense enumerated in subdivision (a), (b), or (d) of Section 12001.6, or who is addicted to the use of any narcotic drug, and who owns, purchases, receives, or has in his or her possession or under his or her custody or control any firearm is guilty of a felony."

"Former section 12021, subdivision (a)(1), made it a felony for a convicted felon to possess 'any firearm.' [T]he purpose of The Dangerous Weapons Control Law, of which former section 12021, subdivision (a) was a part, is to protect the public by denying firearms to felons, who are considered more likely to commit crimes with them." (*Correa, supra*, 54 Cal.4th at p. 344.)

The Supreme Court has recognized that possession of a firearm by a felon is a continuing offense. (*Wright v. Superior Court* (1997) 15 Cal.4th 521, 525, fn. 1 (*Wright*); see *People v. Warren* (1940) 16 Cal.2d 103, 112 (*Warren*).) "The concept of a continuing offense is well established. For present purposes, it may be formulated in the following terms: 'Ordinarily, a continuing offense is marked by a continuing duty in the defendant to do an act which he fails to do. The offense continues as long as the duty persists, and there is a failure to perform that duty.' [Citations.] Thus, when the law

23

imposes an affirmative obligation to act, the violation is *complete* at the first instance the elements are met. It is nevertheless not *completed* as long as the obligation remains unfulfilled. 'The crime achieves no finality until such time.' " (*Wright, supra*, 15 Cal.4th at pp. 525-526, fn. omitted.)

"In the case of continuing offenses, only one violation occurs even though the proscribed conduct may extend over [an] indefinite period." (*People v. Keehley* (1987) 193 Cal.App.3d 1381, 1385 (*Keehley*); see *People v. Davis* (2002) 102 Cal.App.4th 377, 381 (*Davis*).) Thus, our Supreme Court recognized more than 70 years ago that the Deadly Weapons Act, from which former section 12021 is derived, "does not provide that it is an offense for each day that the ex-convict is in possession of the weapon . . . ." (*Warren, supra*, 16 Cal.2d at p. 112.)

Here, Mason was convicted of four counts of possessing the same firearm, corresponding to four different dates of possession.[12] Although the evidence showed that Mason possessed the firearm on each of the dates, there was no evidence that Mason's possession of the firearm was anything but continuous over the period encompassing the four dates. The prosecution did not present evidence, for example, showing that Mason had relinquished possession of the gun for a period between the specified dates. Mason's crime was complete at the time he first possessed the gun

---

[12]     The evidence here is therefore distinguishable from *Correa,* which involved multiple convictions arising from a defendant's possession of *multiple* firearms. (See *Correa, supra*, 54 Cal.4th at pp. 334-335; see also *People v. Crawford* (1982) 131 Cal.App.3d 591, 595-596 [requiring unanimity instruction where defendant was charged with a single count of possession but the evidence showed defendant's simultaneous possession of four separate firearms].)

24

because he violated the duty imposed by the statute not to do so. (See *Wright, supra*, 15 Cal.4th at p. 526.) But the crime continued—as a single offense—for as long as the same possession continued, i.e., so long as Mason continued to violate his duty under the statute. (See *ibid.*; see also *Keehley, supra*, 193 Cal.App.3d at p. 1385.)

Although it involved a different offense, the court's analysis in *Davis* is instructive. In that case, the defendant was convicted of two violations of former section 290, subdivision (a)(1)(A), which required certain sex offenders to register with police within five working days of coming into a city. (*Davis, supra*, 102 Cal.App.4th at p. 381.) Because violation of former section 290 was a continuing offense (former § 290, subd. (g)(8)), the defendant challenged his two convictions. (*Davis, supra*, 102 Cal.App.4th at p. 381.) *Davis* rejected the defendant's argument. The evidence showed that the defendant moved to Los Angeles a first time (thus invoking the duty to register), moved away for a time, then moved back to Los Angeles a second time (invoking the duty to register again). (*Id.* at p. 383.) Because defendant's separate moves to Los Angeles gave rise to two different duties to register, the defendant could properly be convicted of separate violations of each duty, notwithstanding the characterization of the offense as continuing. (*Id.* at pp. 381-382 ["The question here is not whether a continuous offense can be parsed into multiple violations (it can't) but whether a separate offense is committed each time a person required to register as a sex offender enters the same jurisdiction and fails to register within the specified period."].) Here, unlike *Davis*, there was no evidence that Mason's possession of the gun in question was interrupted, such that multiple separate offenses were committed.

25

The Attorney General argues that *Warren* concerned only situations where the underlying possession charges did not specify a particular date or occasion. We disagree. *Warren* states categorically that the Deadly Weapons Act "does not provide that it is an offense for each day that the ex-convict is in possession of the weapon . . . ." and notes that this principle is "especially" true where "the information does not charge the possession on a specific date or on a particular occasion." (*Warren, supra*, 16 Cal.2d at p. 112.) The fact that the principle is "especially" true under such circumstances does not mean that it cannot be true under other circumstances. (See *ibid.*) Subsequent cases interpreting the concepts underlying continuing offenses support this interpretation, as we have discussed. (See *Wright, supra*, 15 Cal.4th at p. 526; *Davis, supra*, 102 Cal.App.4th at pp. 381-382; *Keehley, supra*, 193 Cal.App.3d at p. 1385.) The fact of separate charging alone does not convert a single, continuing offense into multiple offenses.

The Attorney General also argues that Mason's possession occurred at various times and places, and with various objectives. However, these circumstances are irrelevant for purposes of liability under former section 12021, subdivision (a)(1). Regardless of the circumstances of his possession, Mason's crime was not completed until the possession ceased. (See *Wright, supra*, 15 Cal.4th at p. 526.) Mason's possession ceased only after the police chase when the gun was recovered. Because there was no evidence of any interruption before then, Mason committed a single crime. (See *Keehley, supra*, 193 Cal.App.3d at p. 1385.) All but one of Mason's convictions for possession of a firearm by a felon must be reversed for lack of evidence.

The court sentenced Mason to nine terms of life imprisonment without parole. The nine terms consist of one term each for Mason's three first degree murder convictions, which the court then tripled pursuant to the Three Strikes law, section 667, subdivision (e)(2). That section provides, in part, that "the term for the current felony conviction shall be an indeterminate term of life imprisonment with a minimum term of the indeterminate sentence calculated as the greatest of: [¶] (i) Three times the term otherwise provided as punishment for each current felony conviction . . . ." (§ 667, subd. (e)(2)(A).) Mason contends that the court erred in tripling his life sentences without parole because such sentences have no minimum term under the statute.

Courts have reached differing conclusions regarding whether a term of life imprisonment without parole may be doubled or tripled under the Three Strikes law. In *People v. Hardy* (1999) 73 Cal.App.4th 1429, 1434 (*Hardy*), the Court of Appeal for the Second Appellate District held that terms of life imprisonment could be doubled under the Three Strikes law, section 667, subdivision (e)(1). The court found that doubling such terms was consistent with the "intent of the Legislature and voters that persons with prior strikes serve longer sentences . . . ." (*Hardy,* at p. 1434.) The court rejected the argument that doubling terms of life imprisonment without parole was "absurd," noting the possibility that the Governor might commute one or more of the sentences (but leave other sentences in effect). (*Id.* at pp. 1433, 1434.)

The next year, the Court of Appeal for the Third Appellate District disagreed. (*People v. Smithson* (2000) 79 Cal.App.4th 480, 503-504.) In *Smithson*, the court

emphasized that the language of section 667, subdivision (e)(1), allowed doubling only of a determinate term and the minimum term of an indeterminate term. (*Smithson,* at p. 503.) Quoting the Supreme Court's decision in *People v. Jefferson* (1999) 21 Cal.4th 86, 92, the court noted that a determinate term is one " 'consisting of a specific number of months or years in prison.' " (*Smithson,* at p. 503.) Because it does not specify a specific number of months or years in prison, a term of life imprisonment without parole is not a determinate term. (*Ibid.*) Similarly, the minimum term of an indeterminate term is a specified term of incarceration before an inmate is eligible for parole. (*Ibid.*; see *Jefferson,* at p. 96.) Thus, as the court explained, a term of life imprisonment without parole "is an indeterminate sentence *without* a minimum term." (*Smithson,* at p. 503.) Because section 667, subdivision (e)(1), provides for doubling only determinate terms and the minimum term of an indeterminate term, the court concluded that a term of life imprisonment without parole was ineligible for doubling. (*Smithson,* at p. 503.)

In *People v. Coyle* (2009) 178 Cal.App.4th 209, 219, the Court of Appeal for the Third Appellate District extended its precedent in *Smithson* to the sentence tripling provisions of section 667, subdivision (e)(2). The court noted that the rationale in *Smithson* applied equally to the language of that subdivision. (*Coyle,* at p. 219.)

We agree with *Coyle* that the Three Strikes law does not provide for the tripling of a term of life imprisonment without the possibility of parole. The language of section 667, subdivision (e)(2), like subdivision (e)(1), concerns the calculation of the "minimum term" of an indeterminate sentence. A sentence of life imprisonment without parole does not have such a minimum term because it does not allow for parole. (*People v. Smithson,*

28

*supra*, 79 Cal.App.4th at p. 503; see *People v. Jefferson, supra*, 21 Cal.4th at p. 96.) While "life" is the effective minimum that an offender will serve under such a sentence, as the Attorney General points out, it is not the "minimum term" as the phrase is used in the Three Strikes law because it does not differentiate when an inmate will be eligible for parole. (*Smithson*, at p. 503; see *Jefferson,* at p. 96.) A sentence of life imprisonment without parole thus does not contain a term that may be tripled. (*People v. Coyle, supra*, 178 Cal.App.4th at p. 219.)

The rationale cited by *Hardy*, that the purpose of the Three Strikes law was to increase the sentences for second and third strike offenders, is unpersuasive. (See *Hardy, supra*, 73 Cal.App.4th at p. 1434.) An offender sentenced to one term of life imprisonment without parole serves the same sentence as an offender sentenced to three such terms: imprisonment under each sentence will extend for the entirety of the offender's natural life. We likewise find it unlikely that the presence of tripled life sentences without the possibility of parole, for a single offense, would bear in any way on an offender's ability (or inability) to benefit from the Governor's commutation. (Cf. *Hardy,* at pp. 1433-1434.) Commutation of only one of an offender's tripled life sentences without parole, for example, would serve no meaningful purpose.

Because the trial court erred in tripling Mason's life sentences without the possibility of parole from three to nine, we will modify the judgment to reflect a total of three life sentences without the possibility of parole for Mason's three first degree murder convictions.

DISPOSITION

The judgment is reversed with respect to counts 17, 19, and 20. The portions of the sentences on counts 1, 2, and 11 that imposed three indeterminate terms of life without the possibility of parole are modified to reflect the imposition of a single indeterminate term of life imprisonment without the possibility of parole in each count. As so modified, the judgment is affirmed in all other respects. The trial court is directed to prepare an amended abstract of judgment and forward it to the Department of Corrections and Rehabilitation.

McCONNELL, P. J.

WE CONCUR:


O'ROURKE, J.


IRION, J.

30