Filed 4/15/25  P. v. Arellano CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>OMAR PEDRO ARELLANO,<br><br>    Defendant and Appellant. | 2d Crim. No. B331875<br>(Super. Ct. No. VA153217)<br>(Los Angeles County) |

Omar Pedro Arellano appeals the judgment after a jury convicted him of first degree murder (Pen. Code,[1] §§ 187, subd. (a), 189, subd. (a); count 1), attempted willful, deliberate, and premeditated murder (§§ 664/187, subd. (a); count 2), and three counts of firearm possession by a felon (§ 29800, subd. (a)(1); counts 4-6).[2]  The jury found true firearm use allegations as to counts 1 and 2.  (§ 12022.53, subds. (b)-(d).)  The trial court

_____

[1] Further unspecified statutory references are to the Penal Code.

[2] The amended information did not include a count 3.

sentenced Arellano to 25 years to life for count 1 plus 25 years to life for personally and intentionally discharging a firearm causing great bodily injury or death (§ 12022.53, subd. (d)), life with the possibility of parole after seven years for count 2 plus 20 years for personally and intentionally discharging a firearm (§ 12022.53, subd. (c)), a consecutive upper term of three years for count 5, and consecutive eight-month terms each for counts 4 and 6.

Arellano contends there was insufficient evidence to support the murder and attempted murder counts, his counsel rendered ineffective assistance by failing to object to prejudicial gang evidence, one of his convictions for firearm possession must be reversed, the court abused its discretion in sentencing him, and clerical errors in the sentencing minutes and abstract of judgment. We reverse count 5 for unlawful possession of a firearm, but affirm in other respects.

FACTUAL AND PROCEDURAL HISTORY

*The shooting*

Desirea Delgado grew up in the city of Maywood and was an associate of the Maywood Locos gang. She was dating Arellano, a Maywood Locos gang member, in August 2019.

On August 23, 2019, Delgado picked up Arellano in her white minivan and drove to a motel to spend the night. At the motel, Arellano took a firearm from out of his waistband and put it in a drawer. The next morning, Arellano asked Delgado to drive him to his friend's house in Maywood. She drove him to the friend's house, and he sat in the front passenger seat. He was wearing a blue Dodgers jacket and hat. On the drive back to the motel, Arellano said he forgot something at the friend's house. Delgado began driving back to the friend's house when she saw two males walking down Gifford Avenue. Soon after Delgado

made a left turn on 56th Street, Arellano told her to pull over. Arellano got out of the car and walked back towards Gifford Avenue. A couple minutes later, Delgado heard multiple gunshots. "Right away," Arellano returned to the car. He smelled like gun powder. He said that he "banged on two fools" and "shot at them," but told her not to worry because "they got away." "Banged on" meant asking what gang they were from. The area of 56th Street and Gifford Avenue was located within Maywood Locos gang territory.

Delgado and Arellano drove back to the motel and then to Arellano's house. Arellano removed a firearm from his waistband and placed it on a bed. He told his roommate, Jason Ortiz, about the shooting. Delgado looked on Facebook and learned that someone was just killed in Maywood. Arellano said he "fucked up" but told her "not to worry." Sometime after the shooting, Ortiz contacted Delgado and asked if she knew anyone who wanted to buy his firearm. Ortiz's firearm was the one Arellano used in the shooting. Ortiz took several photographs of the firearm. Delgado sold it. Based on the photographs, the firearm appeared to be a .40-caliber Glock pistol.

Abel Canel's home was on 56th Street in Maywood. Between 7:00 a.m. and 8:00 a.m. on the morning of the shooting, he was backing his car into his driveway when he saw a white van turn onto 56th Street from Gifford Avenue. Canel saw a young "Latina" woman driving the van and a man wearing a Dodgers windbreaker and hat in the front passenger seat. He saw the white van stop after turning onto 56th Street and the man "immediately" getting out of the van and walking toward Gifford Avenue. Canel then heard over six gunshots and saw the man get back into the van before it took off. He noticed that the man's hands were in the front waistband area underneath his

3

windbreaker.  A surveillance video depicted a man getting out of a white van on 56th street at 7:21 a.m., and the man returning to the van about a minute later.  Canel verified that a surveillance video taken from 56th Street was consistent with what he saw the morning of the shooting.

Graciela Maldonado lived on Gifford Avenue.  On the morning of August 24, she was woken up by sounds of gunshots.  When she looked out her window, she saw a man lying face up in the street.  Another man moved him onto the sidewalk before running away.

Los Angeles Sheriff's deputies responded to the scene and found Raul Sahagun lying on the ground unresponsive.  Sahagun was shot in the back and the arm.  The gunshot wound to the back was fatal.  Sahagun's former girlfriend testified that he lived on Gifford Avenue and was a member of The Lott gang.

*The investigation*

There were twelve .40-caliber shell casings about 150 feet from Sahagun's body.  A firearm analysis showed that all of the casings were fired from a single Glock pistol.

The police obtained surveillance videos from residences on 56th Street and on Gifford Avenue.  One video depicted two men walking together on the sidewalk on Gifford Avenue and a white minivan driving down the street about a minute later.  The video showed the male passenger wearing a blue jacket and a backwards baseball hat.  At trial, Delgado identified her white van and Arellano in a surveillance video.

About a month after the shooting, Delgado was arrested for driving with a suspended license.  While in custody, the police asked questions about the murder.  The police investigated her phone and obtained search warrants for Delgado's and Arellano's cell phones.  Cell phone records showed that Delgado's and

Arellano's phones were next to the motel around 6:45 a.m. on the day of the shooting.  Around 7 a.m., their phones were near Arellano's friend's house.  Around 7:21 a.m., Delgado's phone was on Gifford Avenue in Maywood.  Around 7:30 a.m., the phones were near the motel again.

*Arrests*

In April 2020, the police arrested Delgado and Arellano at a motel for Sahagun's murder.  The police found a loaded Glock pistol and brass knuckles belonging to Arellano.  They also found a journal with "gang-type" writing on it and a blue Dodgers hat.  The parties stipulated the Glock was not the same firearm that discharged the bullet casings at the crime scene.

Following the arrest, the police interviewed Arellano.  He admitted being a Maywood gang member but denied knowing anything about the shooting.

In June 2021, Delgado told the police about the shooting.  Her timeline of events was consistent with the cell phone mapping records the police had obtained.  Delgado was originally charged with murder and attempted murder.  In September 2021, she was offered a plea deal in exchange for her testimony.  In exchange for her testimony, she agreed to plead guilty to voluntary manslaughter and to be placed on probation.

*Gang expert testimony*

Los Angeles County Sheriff's Detective Francisco Quinones testified as a gang expert for the prosecution.  Quinones testified that gang members are expected to "put in work" which meant committing crimes.  He explained that violent crimes promote the gang's fear and intimidation in the community, and if the community fears the gang, the community is less likely to cooperate with law enforcement.  Quinones also explained the importance of gang territory and described ways in which gangs

5

defend their territory, including "gangbang[ing]." He described "gangbanging" as walking up to a person in gang territory and asking them "where you from"—meaning what gang they belonged to. If there was a perceived threat, the gang member could take physical action such as beating or shooting them. Gang members are expected to bang and protect their territory.

Quinones testified that Maywood is a small city, and the Maywood Locos gang operates in the western part of the city. The area of the shooting was located within Maywood Locos territory. The Maywood Locos gang was a rival of The Lott gang. Quinones identified several Maywood Locos gang tattoos from photographs of Arellano. One of the tattoos was a "SS" which Quinones explained was a "South Side" tattoo. He explained that "South Side is an affiliation to the Mexican Mafia, which . . . is a Hispanic gang which controls the prisons." He explained that "gangs in Southern California pretty much have to fall under the Mexican Mafia. So a lot of Hispanic gangs in Southern California will have South Side . . . to pretty much display their allegiance to the Mexican Mafia." Quinones also testified regarding items that belonged to Arellano with the writing "VMWLSX3" or "VMWLSXIII" on it. He testified the abbreviation meant "Varrio Maywood Locos 13" with "13" representing the gang's affiliation with the Mexican Mafia.

Martin Flores testified as a defense gang expert witness. He opined that Arellano's "SS" tattoo was a geographical tattoo to represent that Maywood was in the south side of Los Angeles County. He explained that it was "not identifying that they are a part of the Mexican Mafia in terms of South Sider." Flores also opined that "VMWLSXIII" stood for "Varrio Maywood Locos 13," and explained that the "13" meant to signify that it was a Southern California gang. Flores opined that "13" does not mean

6

the individual is affiliated with the Mexican Mafia.  He also opined that the shooting took place in the 18th Street gang territory, and not Maywood Locos territory.

## DISCUSSION

*Substantial evidence that Arellano was the shooter*

Arellano contends the murder and attempted murder convictions (counts 1 and 2) must be reversed because there was insufficient evidence that he was the shooter.  He contends that much of the evidence against him came from the testimony of Delgado, who was an accomplice, and her testimony was not sufficiently corroborated.  We are not persuaded.

" ' "In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves.  Rather, we 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]  We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citation.] [¶] The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence . . . . [Citation.]  '[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation.]  We do not reweigh evidence or reevaluate a witness's credibility." ' [Citation.]" (*People v. Ramirez* (2022) 13 Cal.5th 997, 1117-1118.)

Because the prosecution here presented evidence of an accomplice's testimony, a "conviction can not be had upon the testimony of an accomplice unless it be corroborated by such

other evidence as shall tend to connect the defendant with the commission of the offense; . . . the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." (§ 1111.) Section 1111 requires " 'evidence tending to connect defendant with the crimes "without aid or assistance from the testimony of" ' the accomplice. [Citations.]" (*People v. Perez* (2018) 4 Cal.5th 421, 452.) Corroborating evidence " ' "need not independently establish the identity of the victim's assailant" [citation], nor corroborate every fact to which the accomplice testifies [citation], and " 'may be circumstantial or slight and entitled to little consideration when standing alone.' " ' [Citation.]" (*Ibid.*) "But the evidence must nonetheless connect the defendant to the crime itself, rather than simply connect the accomplice to the crime." (*Ibid.*) "The corroborating evidence does not need to independently prove guilt. The evidence simply must support the accomplice testimony and permit a reasonable inference that the accomplice's testimony is true." (*People v. Hall* (2024) 104 Cal.App.5th 1077, 1092.)

Here, Delgado's testimony was corroborated by sufficient evidence to satisfy section 1111's requirements. The cell phone records were consistent with Delgado's story and placed her and Arellano together on the day of the shooting. The records showed that both cell phones were around the location of the motel on the morning of the shooting and around Arellano's friend's house later that morning. Delgado's phone records showed it was close to the crime scene on Gifford Avenue in Maywood at the time the shooting occurred, and around 7:30 a.m. both phones were at the motel again. Furthermore, the surveillance video evidence and Canel's testimony corroborated Delgado's testimony that she was driving a white minivan with Arellano in her front passenger

seat, that Arellano was wearing a blue Dodgers jacket and hat, that her van passed two men walking down Gifford Avenue, and that Arellano got out of the car on 56th Street and came back about a minute later.  And photographs of the firearm Delgado sold after the shooting were consistent with the type of firearm used at the crime scene, according to the ballistic evidence.  In sum, multiple details of Delgado's testimony were corroborated by independent evidence.

We conclude that such evidence and Delgado's testimony constituted substantial evidence to support that Arrellano was the shooter.  (See *People v. Avila* (2009) 46 Cal.4th 680, 703 [testimony of a single witness can be sufficient proof of any fact].)  Delgado testified that she stopped her van on 56th Street, Arellano got out and walked towards Gifford Avenue, she heard multiple gunshots, and Arellano immediately returned to the van smelling like gunpowder.  She also testified that Arellano said he "banged on two fools" and shot at them.  When Delgado learned that someone was just killed in Maywood, Arellano said he "fucked up" but told her "not to worry."  The surveillance videos, cell phone records, and Canel's testimony support Delgado's testimony.  The photographs of the firearm sold after the shooting was also consistent with the ballistic evidence at the crime scene.  Furthermore, there was evidence of motive.  Arellano was a Maywood Locos gang member and Sahagun was a rival gang member from The Lott, and the murder happened in Maywood gang territory.  Substantial evidence supports the finding that Arellano was the shooter.

*Substantial evidence of attempted murder*

Arellano contends the evidence was insufficient to support attempted murder of John Doe (count 2).  We conclude otherwise.

9

To prove attempted murder, "the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citation.]" (*People v. Canizales* (2019) 7 Cal.5th 591, 602.) "Direct evidence of intent to kill is rare, and ordinarily the intent to kill must be inferred from the statements and actions of the defendant and the circumstances surrounding the crime." (*Ibid.*)

Arellano fired his firearm at least 12 times and was successful in killing one of the men. Evidence of a shooter firing multiple times towards a group of victims can support an inference the shooter harbored a specific intent to kill all of them. (See *People v. Foster* (2021) 61 Cal.App.5th 430, 445 [firing a firearm multiple times at a group was substantial evidence supporting a jury finding of the specific intent to kill, and the direct but ineffective step towards killing victims who survived the shooting]; *People v. Garcia* (2012) 204 Cal.App.4th 542, 554 ["Shooting at a group from a distance at which a mortal wound could be inflicted supports an inference of an intent to kill"].)

Surveillance video evidence also established that Doe and Sahagun were walking together on Gifford Avenue around the time of the shooting. Maldonado testified that immediately after the shooting, Doe moved Sahagun onto the sidewalk. Delgado testified that Arellano said he "banged on *two* fools" and "shot at *them*," which supports his intent to kill both Sahagun and Doe. (Italics added.) Substantial evidence supports the conviction for the attempted murder of John Doe.

### Gang evidence

Arellano contends the trial court admitted prejudicial gang evidence referencing the Mexican Mafia. He acknowledges defense counsel did not object, but contends counsel rendered ineffective assistance by failing to object. We disagree.

10

The prosecution did not pursue any gang enhancements. But over the defense's objection, the trial court allowed the prosecution to present gang evidence for the limited purpose of proving motive, intent, and identity. Detective Quinones testified generally about gangs and the Maywood Locos gang. He also referenced the Mexican Mafia when testifying about Arellano's gang tattoos and a written inscription on items belonging to Arellano. He said that Arellano's "SS" tattoo represented the "South Side," an affiliation to the Mexican Mafia. He also opined that the written inscription's inclusion of the number 13 represented an affiliation with the Mexican Mafia because "M" was the 13th letter in the alphabet. Flores, the defense gang expert, disagreed that the "SS" tattoo and the number 13 represented associations with the Mexican Mafia.

To prevail on an ineffective assistance of counsel claim, a defendant must show trial counsel's performance was deficient and resulting prejudice. (*People v. Mickel* (2016) 2 Cal.5th 181, 198 (*Mickel*); *Strickland v. Washington* (1984) 466 U.S. 668.) To prove deficient performance, the "defendant bears the burden of showing that counsel's performance ' " ' "fell below an objective standard of reasonableness . . . under prevailing professional norms." ' " ' [Citation.] To demonstrate prejudice, defendant bears the burden of showing a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. [Citations.]" (*Mickel*, at p. 198.)

In evaluating the deficiency prong, we presume "counsel's actions fall within the broad range of reasonableness, and afford 'great deference to counsel's tactical decisions.' [Citation.]" (*Mickel*, *supra*, 2 Cal.5th at p. 198.) We will not reverse a conviction unless there is affirmative evidence counsel had

11

" ' " ' no rational tactical purpose' " ' " for the act or omission. (*Ibid.*)

Here, the record does not disclose why counsel did not object to Detective Quinones's references to the Mexican Mafia. Therefore, we presume there was a rational tactical decision for not objecting. For example, counsel could have made a tactical decision not to object so that the defense gang expert could contradict Detective Quinones's testimony. This case presented competing gang expert testimony, and such a tactic could have put the prosecution witness's reliability into question.

Regarding prejudice, the testimony and reference to the Mexican Mafia was brief. Detective Quinones did not describe the Mexican Mafia in detail and the prosecutor did not belabor the point. The trial court also provided a limiting instruction regarding the gang evidence. We presume the jury understood and followed the instruction. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 107.) In our view, there is no reasonable probability that the outcome would have been more favorable to Arellano had his counsel objected. We conclude there was no ineffective assistance of counsel.

*Firearm possession convictions (counts 4 and 5)*

Arellano contends, and the Attorney General concedes, that one of his convictions for possession of a firearm by a felon (either count 4 or 5) must be reversed because possession of the same firearm was a continuous offense.[3] (*People v. Mason* (2014) 232 Cal.App.4th 355, 367 (*Mason*).) We agree.

" 'In the case of continuing offenses, only one violation occurs even though the proscribed conduct may extend over [an] indefinite period.' [Citation.]" (*Mason, supra,* 232 Cal.App.4th at

---

[3] Count 6 alleged possession in April 2020.

12

p. 365.) Thus, where possession of a firearm is continuous and there is no evidence that possession ceased, the defendant only commits a single offense and cannot be convicted of more than one count of unlawful possession. (*Id.* at pp. 366-367.) If the defendant is convicted of multiple counts, all but one count must be reversed for lack of evidence. (*Id.* at p. 367.)

Here, it was alleged that count 4 occurred on August 23, 2019, the day before the shooting. Count 5 occurred on August 24, 2019, the day of the shooting. There was no evidence that Arellano's possession of the same firearm was interrupted between those two days. Thus, count 5 must be reversed because the crime was "complete" when Arellano first possessed the firearm on August 23 (count 4) and "violated the duty imposed by the statute not to do so." (*Mason*, *supra*, 232 Cal.App.4th at p. 366; see also *People v. Ratcliff* (1990) 223 Cal.App.3d 1401, 1410 ["the crime is committed the instant the felon in any way has a firearm within his control" (italics omitted)].)

Because we reverse the conviction for count 5 and the sentence on that count was the primary determinate term, the trial court must select which primary term to impose for either count 4 or 6. (§ 1168, subd. (a); Cal. Rules of Court, rule 4.451(a).) When resentencing Arellano, the trial court " 'is entitled to consider the entire sentencing scheme. Not limited to merely striking illegal portions, the trial court may reconsider all sentencing choices. [Citations.] This rule is justified because an aggregate prison term is not a series of separate independent terms, but one term made up of interdependent components.' " (*People v. Burbine* (2003) 106 Cal.App.4th 1250, 1258; see also *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can

13

exercise its sentencing discretion in light of the changed circumstances' "].)  Since Arellano is entitled to resentencing on remand, we do not consider the arguments regarding purported sentencing errors.  Any clerical errors and inaccuracies as to the description of the sentence for count 2 regarding the abstract of judgment and sentencing minutes should be corrected upon resentencing.

## DISPOSITION

Count 5 is reversed.  The matter is remanded for a full resentencing.  We express no view as to how the trial court shall exercise its sentencing discretion upon resentencing.  After resentencing, the court shall prepare an amended sentencing minute order and abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.

BALTODANO, J.

We concur:

YEGAN, Acting P. J.

CODY, J.

14

Debra Cole-Hall, Judge

Superior Court County of Los Angeles

_____

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Jason Tran and Herbert S. Tetef, Deputy Attorneys General, for Plaintiff and Respondent.