Filed 8/4/16  P. v. Torres CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B266700 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. LA076080) |
| v. | |
| RAYMUNDO TORRES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Susan M. Speer, Judge. Reversed in part; Affirmed in part; Vacated in part and Remanded.

Law Offices of John F. Schuck and John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Connie H. Kan, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted appellant Raymundo Torres of two counts of attempted premeditated murder (Pen. Code, §§ 664/187, subd. (a)),[1] one count of shooting at an occupied vehicle (§ 246), one count of assault with a firearm (§ 245, subd. (a)(2)), and two counts of being a felon in possession of a firearm (§ 29800, subd. (a)(1)).  Appellant challenges the denial of his *Wheeler/Batson* motion.  (*People v. Wheeler* (1978) 22 Cal.3d 258, overruled in part by *Johnson v. California* (2005) 545 U.S. 162; *Batson v. Kentucky* (1986) 476 U.S. 79.)  Appellant also argues that one of his convictions for possession of a firearm by a felon should be reversed.  He further asks that we independently review the transcript of the in camera hearing held regarding his *Brady* motion.  (*Brady v. Maryland* (1963) 373 U.S. 83.)  Finally, appellant asks that we remand for resentencing on count 5 and that we correct clerical errors in the abstracts of judgment.

We affirm the trial court's denial of appellant's *Wheeler/Batson* motion.  We have independently reviewed the *Brady* transcript and find no error.  However, we reverse the judgment on count 6, one of appellant's convictions for possession of a firearm by a felon.  We vacate the sentence imposed on count 5 and remand for the trial court to clarify whether the sentence is imposed consecutive to or concurrent with the indeterminate sentence, and we direct the superior court to correct clerical errors in the abstracts of judgment, as discussed below.  In all other respects, the judgment is affirmed.

---

[1]     Further unspecified statutory references are to the Penal Code.

# BACKGROUND

*Prosecution Evidence*

*Count 5 (Assault with a Firearm)*

On November 15, 2013, around 1:50 a.m., Jose Lopez went to the police station by the courthouse in Van Nuys to turn himself in on a bench warrant that had been issued for his failure to appear in court. The officer he spoke with was unable to find the bench warrant, so Lopez left and sat on a wall outside the courthouse.

As Lopez was sitting on the wall, appellant, another man, and a woman approached Lopez. Appellant walked up to Lopez and asked him, "Where the fuck you from?" Lopez understood this to mean appellant was asking what gang he was from, but Lopez responded that he was not in a gang. Appellant pointed a gun at Lopez's head and repeated his question more aggressively. Lopez again said that he was not in a gang. Appellant repeated the question three to four times. Appellant was standing about three feet from Lopez and kept the gun pointed at Lopez throughout the incident.

At one point, Lopez offered appellant his wallet, telling him that he had over a hundred dollars in it. Appellant replied, "Yeah, but fuck that right now, I'm taking care of business." Appellant also mentioned his gang, B.V.N., which Lopez knew to be a Van Nuys gang.

Appellant told Lopez to pull up his shirt so he could see if Lopez had any tattoos. When Lopez lifted his shirt, appellant pointed his gun at Lopez's stomach. After appellant saw that Lopez had no tattoos, he hit Lopez in the head with the gun. He hit Lopez so hard that Lopez spun around and ended up facing the courthouse. Appellant then told Lopez to lift his shirt to see if he had tattoos on his back. After Lopez showed his back to appellant, appellant said, "This is big,

3

fuckin', bad ass B.V.N." Appellant told Lopez his gang moniker and walked away with his two companions.

Lopez waited until appellant was far enough away that "his aim would be off," then Lopez ran to the police station. A short time later Lopez heard gunshots.

Lopez identified appellant from a photographic six-pack lineup prepared by the investigating officer, Detective Russell Pungrchar.

*Counts 1-3 (Attempted Murder; Shooting at an Occupied Vehicle)*

Around 1:50 a.m. on November 15, 2013, Adam Santhon and Damarie Fawcett were driving near the Van Nuys courthouse when they saw appellant walking in the middle of the street. Appellant turned around and made a gang sign at Santhon and Fawcett. Fawcett saw something in appellant's hand and was afraid appellant was going to shoot at them. Appellant began running toward Santhon's car, and Santhon saw him pull out a weapon. Fawcett saw appellant point a gun at them and told Santhon he recognized appellant from school. Santhon "slammed on the gas and took off." As Santhon sped away, appellant started shooting; Santhon and Fawcett heard six to seven gunshots.

Santhon and Fawcett pulled over and found a bullet hole in the car. Fawcett flagged down a passing police car, and he and Santhon told the officers what had happened. One of the officers told Santhon that the man who had shot at them "had just pistol whipped somebody on Van Nuys."

Fawcett told the police that appellant's nickname was "Chucky." One of the officers showed Fawcett some pictures on his cell phone, and Fawcett identified appellant as the shooter. Santhon subsequently identified appellant in a photographic six-pack lineup.

4

Officer Lance Novak had been assigned to the Van Nuys gang detail since April 2011 and testified about the Barrio Van Nuys gang. He opined that appellant was a member of the gang, based on his numerous contacts with appellant, who admitted being a member, and on appellant's multiple gang tattoos. He testified that appellant's gang moniker was "Chucky" and that the gang was involved in drugs, extortion, attempted murders, and robberies. When presented with a hypothetical based on the facts of this case, Officer Novak opined that the acts were done for the benefit of the gang.

Detective Pungrchar had spoken with appellant in 2008, 2009, and 2011. On those occasions, appellant told Detective Pungrchar that his nickname was "Chucky" and that he had been a member of the Barrio Van Nuys gang for two to three years as of 2011. Appellant was arrested on December 2, 2013.

*Defense Evidence*

Dr. Mitchell Eisen, an expert in eyewitness identification, testified that it is not unusual for many witnesses to mistakenly identify the same person. He testified that stress and trauma can have an adverse affect on memory and that it is difficult for witnesses to identify someone of a different racial background. Dr. Eisen also testified about potential problems with photographic lineups.

*Procedural Background*

Appellant was charged by information with six counts: counts 1 and 2, attempted premeditated murder (§§ 664/187, subd. (a)); count 3, shooting at an occupied motor vehicle (§ 246); counts 4 and 6, possession of a firearm by a felon (§ 29800, subd. (a)(1)); and count 5, assault with a firearm (§ 245, subd. (a)(2)). The information alleged as to counts 1, 2, and 3 that appellant personally used a

5

firearm (§ 12022.53, subd. (b)) and personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and as to count 5 that he personally used a firearm (§ 12022.5). It alleged as to all counts that the offenses were committed for the benefit of a gang. (§ 186.22, subd. (b)(1)(C).)

The jury found appellant guilty of all six counts and found the firearm and gang allegations to be true. The court sentenced appellant as follows: count 1, life plus 20 years for the firearm allegation; count 2, life plus 20 years for the firearm allegation, concurrent with count 1; count 3, the low term of three years plus five years for the gang allegation,[2] stayed pursuant to section 654; count 4, the low term of two years, concurrent; count 5, the low term of two years plus three years for the firearm allegation; and count 6, the low term of two years, stayed pursuant to section 654. Appellant filed a timely notice of appeal.

## DISCUSSION

I. *Wheeler/Batson Motion*

During jury selection, the prosecutor used peremptory challenges to excuse three Hispanic jurors – Juror Nos. 3243, 8481, and 7321 – and one African American juror – Juror No. 6655. At side bar, following the challenge to Juror No. 7321, defense counsel made a *Wheeler/Batson* motion. The trial court found a prima facie case and asked the prosecutor to explain his reasons for excusing these

---

[2] The trial court mistakenly stated that the total term on count 3 was seven years; however, the minute order correctly states that it is eight years. (See *People v. Thompson* (2009) 180 Cal.App.4th 974, 978 ["We realize the general rule is that the oral pronouncements of the court are presumed correct. [Citation.] Nonetheless, under these circumstances, we will deem the minute order and the abstract of judgment to prevail over the reporter's transcript. [Citations.]" ].) The court subsequently corrected the mathematical error.

6

jurors. The prosecutor stated his reasons, which we discuss below. After hearing the prosecutor's explanations and defense counsel's arguments, the trial court found that the prosecutor's reasons were credible and race-neutral. The court therefore denied the *Wheeler/Batson* motion.

The test for analyzing *Wheeler/Batson* claims is well-established. "'First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race. Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason. Third, the court determines whether the defendant has proven purposeful discrimination. The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. [Citation.]' . . . [¶] 'Review of a trial court's denial of a *Wheeler/Batson* motion is deferential, examining only whether substantial evidence supports its conclusions. [Citation.] ". . . We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal. [Citation.]" [Citation.]' [Citation.]" (*People v. Taylor* (2009) 47 Cal.4th 850, 885–886 (*Taylor*).) "Even a brief reference to the prosecutor's reasons and the trial court's own observations of the challenged jurors can constitute a sincere and reasoned evaluation of the credibility of the prosecutor's justifications. [Citations.]" (*People v. Fiu* (2008) 165 Cal.App.4th 360, 399.)

We discuss each challenged juror in turn. "A prosecutor must provide a clear and reasonably specific explanation of legitimate reasons for exercising a

challenge. [Citation.] 'The justification need not support a challenge for cause, and even a "trivial" reason, if genuine and neutral, will suffice.' [Citation.] A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons. [Citations.]" (*People v. Aleman* (2016) 247 Cal.App.4th 660, 671 (*Aleman*).)

### A. *Juror No. 3243*

Juror No. 3243, a Hispanic woman, stated that her brother was murdered by the police in 1984 and that the charges against the officers were dismissed. When asked how she felt about that she replied, "Not good, obviously." Although she was "not sure" whether she would automatically be biased against members of the police department, she stated that she could set aside what happened to her brother and evaluate the officers "as individuals."

The prosecutor gave the following reason for excusing Juror No. 3243: "Juror No. 3243, her brother was killed by cops. She said she wasn't sure if she was biased against law enforcement. That's why I kicked her." Defense counsel argued that Juror No. 3243 specifically stated that she was not biased against the police and would be able to evaluate the individual testimony of police officers.

"'[A] prosecutor may reasonably surmise that a close relative's adversary contact with the criminal justice system might make a prospective juror unsympathetic to the prosecution.' [Citation.]" (*People v. Jones* (2013) 57 Cal.4th 899, 920; see also *People v. Arellano* (2016) 245 Cal.App.4th 1139, 1161 (*Arellano*) ["The use of peremptory challenges to exclude potential jurors who have had negative experiences with the criminal justice system, or have relatives and/or family members in prison, is not unconstitutional. [Citations.]"].) Although Juror No. 3243's brother may not have had adversarial contact with the criminal

8

justice system, his alleged murder by police officers certainly might be seen as making the juror unsympathetic to law enforcement and thus to the prosecution.

Appellant argues that the prosecutor did not question Juror No. 3243 about the killing. However, the juror's statement that police officers "murdered" her brother without any consequences expresses her beliefs about the killing; further questioning was not necessary. Thus, even though Juror No. 3243 expressed the ability to evaluate the testimony of police officers without bias, her experience is a legitimate, nondiscriminatory justification for dismissing her.

### B.    *Juror No. 8481*

Juror No. 8481 was a single male Hispanic. He had graduated from culinary school six to seven years previously and had worked as a chef ever since. His "significant other" was a photographer. When the prosecutor asked about his future plans, he replied that he planned to remain with his current company, which was growing internationally and had room for advancement.

During questioning by defense counsel, the juror asked questions concerning the effect of an acquittal of one charge on resolution of the other charges: "[Y]ou said all four [charges] have to be proven beyond a reasonable doubt and if one of them is not, he's acquitted of all of them. Is that how it works?" Defense counsel replied that the jurors had to consider each charge separately. The juror asked: "So, for example, let's say he gets proven guilty for the first charge, which was [attempted premeditated murder] . . . , he doesn't get fully – like fully proven guilty for another one, does that one like fall to the wayside, the first one, or how does that work?" After further explanation by defense counsel and the court that each count had to be determined separately, the juror replied, "Okay, yes, then I can, then I would be fine."

The prosecutor gave the following explanation for dismissing Juror No. 8481: "[A]t first I liked him . . . when I initially saw him, but he didn't have any roots. He's not married, got no kids. He just graduated from culinary school in Pasadena. [¶] I don't know how hard it is to try to get a job as a chef out there, but he's very young, limited life experience. [¶] I asked a lot of questions. Out of all the jurors, the most interplay as far as the most dialogue between questions coming from any of the jurors was with this juror 8481 and with [defense counsel]. That's why I got rid of him."

As appellant points out, some of the prosecutor's stated reasons were not accurate. Juror No. 8481 had not "just" graduated from culinary school, but had graduated six to seven years prior to trial. In addition, although the prosecutor stated that the juror had no roots, in fact the juror had worked as a chef since graduating from culinary school. He planned to continue working with the same company, which was expanding globally, and he was in a relationship with a "significant other," who worked as a photographer.

However, as our Supreme Court has observed, "[t]he purpose of a hearing on a *Wheeler/Batson* motion is not to test the prosecutor's memory but to determine whether the reasons given are genuine and race neutral. 'Faulty memory . . . that might engender a "mistake" of the type the prosecutor proffered to explain [a] peremptory challenge are not necessarily associated with impermissible reliance on presumed group bias.' [Citation.] [An] 'isolated mistake or misstatement' [citation] does not alone compel the conclusion that this reason was not sincere." (*People v. Jones* (2011) 51 Cal.4th 346, 366.)

Here, although the prosecutor was mistaken as to whether the juror had just graduated and had no roots, the other reasons offered were accurate and race-neutral. Juror No. 8481 was not married and did not have children. Appellant

10

argues that being single and having no children "is a suspect reason for challenging a prospective juror." However, limited life experience has been held to be "a race-neutral explanation for a peremptory challenge. [Citations.]" (*People v. DeHoyos* (2013) 57 Cal.4th 79, 108 (*DeHoyos*).)

The prosecutor also cited Juror No. 8481's dialogue with defense counsel. In that dialogue, the juror raised the issue of acquittal, and appeared to believe (at least initially) that an acquittal of one charge required an acquittal of all. In light of this exchange with defense counsel, the prosecutor could reasonably be concerned that the juror might be inclined to render at least a partial defense verdict, or might become confused as to the legal principles governing determination of the case. On this basis, the excusal was not impermissible. "Jurors may be excused based on 'hunches' and even 'arbitrary' exclusion is permissible, so long as the reasons are not based on impermissible group bias. [Citation.]" (*People v. Turner* (1994) 8 Cal.4th 137, 165, disapproved on another ground in *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5); see *Aleman*, *supra*, 247 Cal.App.4th at p. 671 ["A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons. [Citations.]"].)

### C.    *Juror No. 7321*

Juror No. 7321, a single male Hispanic, was a Fed Ex driver. In 2013, his father was arrested for grand theft and was incarcerated for four months. When asked if he thought his father was treated fairly by the police, he replied, "I hope so." Nonetheless, he believed that his father "got the punishment that fit the crime." He stated that this incident would not affect him as a juror.

The prosecutor gave the following explanation for dismissing Juror No. 7321. "He's also a young man. He's unmarried, he's single. He has no kids. His

11

father went to state prison. [¶] I thought that, you know, the fact that he didn't know whether or not he was treated fairly by law enforcement, the fact that he went to state prison for grand theft might make him feel biased. [¶] He's also very young and limited experience and had long hair and kind of tied up in a bun. [¶] And I think, you know, that youth plus, you know, the lack of roots would tend to make him, I guess, more susceptible particularly to some of the defense experts that are going to be coming in. I'm going to be challenging them critically. [¶] But as far as, you know, anyone with any academic degrees or, you know, being a professor at any place, those are all going to be defense experts. And some of the people that will evaluate them critically and I don't think – I don't think young individuals like the young woman who is a mechanical engineer that I also kicked are likely to do that."

Defense counsel argued that Juror No. 7321's father could not have gone to state prison because it was only a four-month term and that the juror expressed the opinion that his father was treated fairly. She further argued that there were other jurors with family members charged with crimes. In addition, she pointed out the prosecutor's inconsistency in stating that Juror No. 7321 could not evaluate scientific evidence, yet the other potential juror he thought would be unable to evaluate scientific evidence was a mechanical engineer.

As noted above, limited life experience has been held to be a race-neutral justification for a peremptory challenge. (*DeHoyos*, *supra*, 57 Cal.4th at p. 108.) In addition, "[a] concern with a juror's ability to understand the proceedings and anticipated testimony is another proper basis for a challenge. [Citations.]" (*Ibid.*) Thus, the prosecutor's concern about Juror No. 7321's susceptibility to defense experts is a race-neutral justification. Finally, Juror No. 7321's statement that he "hope[d]" his father was treated fairly by the police indicates uncertainty regarding

12

his father's treatment.  Because a family member's adverse experience with the criminal justice system is a race-neutral justification for a peremptory challenge (*Arellano*, *supra*,  245 Cal.App.4th at p. 1161), we defer to the trial court's conclusion.  (See *Taylor*, *supra*, 47 Cal.4th at p. 886.)

D.     *Juror No. 6655*

Juror No. 6655, an African-American male, said that five or six years previously, his father had been arrested for battery.  He did not know what happened in his father's case, but he believed his father was treated fairly and did not think his father's case would affect him as a juror.  No family member or close friend had ever been a crime victim or a witness to a crime.  He had about 10 tattoos, which he described as representing important events in his life.

As to Juror No. 6655, the prosecutor stated, "he was interesting.  His family has – his father was arrested for something, he's not sure what, some sort of battery.  We don't know if it's spousal battery. We don't know if it was assault with a deadly weapon.  [¶]  You know, he has two tattoos.  He has one on the right side of his neck, he has one on the back of his neck, and he said there's eight other tattoos.  I don't know what they are, what they represent.  [¶]  He has a very interesting Twitter feed.  I looked him up.  He's mentioned that he was on jury duty.  I didn't like that.  [¶]  The Twitter feed also had a lot of information, you know, to things where his comment would be 'Where's my gun,' 'I'll go get my gun,' was in at least two Twitter feeds, so I didn't like that as well."  Defense counsel argued that there were other jurors with tattoos who were not kicked off the panel, but the prosecutor stated that he kicked off the other juror who had tattoos.

13

The prosecutor's stated reasons are race-neutral. Juror No. 6655's father had been arrested and incarcerated. (See *Arellano*, *supra*, 245 Cal.App.4th at p. 1161.) In addition, his numerous tattoos, and his comments on social media about guns are nondiscriminatory justifications for dismissing him. (See *Aleman*, *supra*, 247 Cal.App.4th at p. 671 [prospective juror may be excused based on gestures, hunches, and arbitrary reasons].)

E.    *Comparative Juror Analysis*

Appellant argues that a comparative juror analysis shows that the responses of Juror Nos. 3243, 8481, 7321, and 6655 were not different from the responses of prospective jurors who were not dismissed. "Comparative juror analysis must be performed for the first time on appeal on review of claims of error at *Batson/Wheeler's* third stage, as here, when the defendant relies on such evidence, and when the record is adequate to permit the comparisons. [Citation.] The reviewing court need only consider responses by stricken panelists or seated jurors identified by the defendant in the claim of disparate treatment. [Citation.]" (*People v. Hamilton* (2009) 45 Cal.4th 863, 902, fn. 12.) Appellant cites for comparison Juror Nos. 1121, 6529, and 9381.[3]

Juror No. 6529 was the victim of two burglaries and a hit-and-run accident, all of which were unsolved, but she believed she could be fair to appellant. Appellant does not elaborate on his argument, but presumably the contention is

_____

[3]    Juror No. 1121 was dismissed by the prosecutor, and therefore does not provide a useful comparison to the challenged jurors dismissed by the prosecutor. (See *Arellano*, *supra*, 245 Cal.App.4th at p. 1160 ["'The rationale for comparative juror analysis is that a side-by-side comparison [of the characteristics and voir dire responses] of a prospective juror struck by the prosecutor with a prospective juror accepted by the prosecutor may provide relevant circumstantial evidence of purposeful discrimination by the prosecutor.' [Citation.]"].)

that the prosecutor dismissed Juror No. 3243, whose brother was murdered, but accepted other jurors who were crime victims. In addition to Juror No. 6529, the prosecutor accepted three other jurors who were crime victims, Juror Nos. 2152 (thefts of purses), 0512 (burglary), and 4905 (vandalism, theft, and burglaries). However, the severity of these crimes does not compare to Juror No. 3243's statement that her brother was murdered by the police. Thus, the prosecutor's acceptance of Juror Nos. 6529, 2152, 0512, and 4905 does not establish that the dismissal of Juror No. 3243 was based on discriminatory intent.

Appellant further argues that Juror No. 6529's best friend's husband is a sheriff, but does not explain how this characteristic indicates discrimination in the dismissal of Juror Nos. 3243, 8481, 7321, and 6655. The dismissed jurors did not have close friends or family members employed by a law enforcement agency, other than Juror No. 3243, whose sister was a clerk in an office where police officers were trained. As discussed above, Juror No. 3243's assertion that her brother had been "murdered" by police officers provided a legitimate nondiscriminatory justification for her dismissal.

Juror No. 9381 reported that her six-year-old daughter had been the victim of molestation by a neighbor 40 years prior, but the perpetrator was found not guilty by the jury. She thought the jury's decision had been wrong, but she believed that "the system worked as it should" and that she could be fair to both sides. Appellant argues that Juror No. 9381 was accepted by the prosecutor but again does not explain how this establishes discrimination. In contrast to Juror No. 9381, whose daughter was victimized by a neighbor, Juror No. 3243 stated that her brother had been murdered by police officers, which clearly could have raised a different concern for the prosecutor. This comparison is not sufficient to establish invidious discrimination in the prosecutor's exercise of peremptory challenges.

15

"The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike. [Citation.]" (*People v. Cox* (2010) 187 Cal.App.4th 337, 341.) Appellant has failed to establish that the prosecutor's peremptory challenges were based on purposeful discrimination.

II.      *Convictions for Possession of a Firearm*

Appellant contends that one of his two convictions for possession of a firearm by a felon must be reversed because the crime is a continuing offense. We agree, and respondent concedes that appellant is correct.

"The Supreme Court has recognized that possession of a firearm by a felon is a continuing offense. [Citations.] 'The concept of a continuing offense is well established. For present purposes, it may be formulated in the following terms: "Ordinarily, a continuing offense is marked by a continuing duty in the defendant to do an act which he fails to do. The offense continues as long as the duty persists, and there is a failure to perform that duty." [Citations.] Thus, when the law imposes an affirmative obligation to act, the violation is *complete* at the first instance the elements are met. It is nevertheless not *completed* as long as the obligation remains unfulfilled. "The crime achieves no finality until such time."' [Citation.] [¶] 'In the case of continuing offenses, only one violation occurs even though the proscribed conduct may extender over [an] indefinite period.' [Citations.]" (*People v. Mason* (2014) 232 Cal.App.4th 355, 365  (*Mason*).)

In *Mason*, the court reversed three of the defendant's four convictions for possession of a firearm by a felon, even though the four convictions stemmed from four different dates of possession, months apart. The court reasoned that the "crime was complete at the time he first possessed the gun because he violated the duty imposed by the statute not to do so," and that "the crime continued—as a

16

single offense—for as long as the same possession continued, i.e., so long as [the defendant] continued to violate his duty under the statute. [Citations.]" (*Mason*, *supra*, 232 Cal.App.4th at p. 366.)

Here, "there was no evidence that [appellant's] possession of the gun in question was interrupted, such that multiple separate offenses were committed." (*Mason*, *supra*, 232 Cal.App.4th at p. 366.) Appellant's assault on Lopez and the shooting at Santhon and Fawcett occurred minutes apart. There was no break in appellant's possession of the firearm. Indeed, the prosecutor argued that appellant used the same gun in both incidents. One of appellant's convictions for possession of a firearm by a felon must be reversed. (*Mason*, *supra*, 232 Cal.App.4th at p. 367.)

III.     *Brady Motion*

Appellant asks that we independently review the transcript of the in camera hearing on his *Brady* motion regarding Officer Albers, who spoke with Santhon and Fawcett and wrote the report on the shooting incident. We independently review the sealed records of in camera hearings to determine whether the trial court's denial of disclosure of police personnel records constituted an abuse of discretion. (*People v. Myles* (2012) 53 Cal.4th 1181, 1209.)

Appellant's trial counsel asked the prosecutor for *Brady* discovery on Officer Albers. Her request was based on the fact that Officer Albers had left both the Los Angeles County Sheriff's Department and the Los Angeles Police Department within a short period of time, despite being a "fairly recent hire and probably young." She argued that the prosecutor had an affirmative duty to disclose *Brady* material, including any discovery as to why Officer Albers left two law enforcement agencies within such a short time period.

The court held an in camera hearing, at which Captain Ivan Minsal testified that Officer Albers graduated from the police academy in August 2013 and was assigned as a probationary patrol officer to the Van Nuys area. Officer Albers resigned from the police department in February 2014 after receiving nine unsatisfactory reports due to his job performance. Captain Minsal testified that Officer Albers had "no integrity issues" but that he "just couldn't grasp the things that he needed to do as a police officer." Captain Minsal had not examined the officer's personnel records, but he was not aware of any misconduct by the officer.

The trial court found there was no *Brady* material that needed to be disclosed. Defense counsel argued that the evidence presented by the prosecution was inadequate because Captain Minsal did not inspect Officer Albers' personnel file. The court found no probable cause existed for subpoenaing the personnel records.

"Under *Brady* . . . and its progeny, the prosecution has a constitutional duty to disclose to the defense material exculpatory evidence, including potential impeaching evidence. The duty extends to evidence known to others acting on the prosecution's behalf, including the police. [Citations.] . . . For *Brady* purposes, evidence is material if it is reasonably probable its disclosure would alter the outcome of trial. [Citations.]" (*People v. Superior Court (Johnson)* (2015) 61 Cal.4th 696, 709-710 (*Johnson*).)

"By contrast, '[u]nder *Pitchess*, a defendant need only show that the information sought is material "to the subject matter involved in the pending litigation." ([Evid. Code,] § 1043, subd. (b)(3).) Because *Brady*'s constitutional materiality standard is narrower than the *Pitchess* requirements, any [information] that meets *Brady*'s test of materiality necessarily meets the relevance standard for

18

disclosure under *Pitchess*. [Citation.]' [Citation.]" (*Johnson*, *supra*, 61 Cal.4th at pp. 711-712.)

Appellant's request for *Brady* material was based on the suggestion that Officer Albers' short employment history with the Los Angeles County Sheriff's Department and the Los Angeles Police Department may have affected the report he wrote on the shooting incident. However, as the trial court reasoned, even if Officer Albers "left under less than amiable terms from either department," his ability to take a report from Santhon and Fawcett probably would not have been affected by any alleged misconduct. The court further noted that Officer Albers "appeared to play a very minor role . . . in the case in chief." The court described defense counsel's suggestion that there was *Brady* material based solely on Officer Albers' employment history as "total speculation."

"'There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one . . . .' [Citations.] Moreover, '*Brady* . . . does not require the disclosure of information that is of mere speculative value' [citation] . . . .'" (*People v. Williams* (2013) 58 Cal.4th 197, 259; see *People v. Ashraf* (2007) 151 Cal.App.4th 1205, 1214 ["mere speculation that there *might have been* something useful for impeachment purposes in those reports is not sufficient to demonstrate a *Brady* violation."].) We have independently reviewed the sealed reporter's transcript of the in camera hearing, and we find no error or abuse of discretion.

IV. *Abstract of Judgment*

Appellant asks that we correct the abstract of judgment to reflect the sentence imposed by the trial court. He further argues that the record is unclear as to whether the trial court intended the sentence on count 5, assault with a firearm, to be concurrent or consecutive. Respondent concedes that the trial court's

intention regarding the sentence on count 5 is unclear and that remand is appropriate. Respondent also concedes that the abstract of judgment should be corrected.

At the sentencing hearing, the trial court sentenced appellant on count 5 to "the low term of two years in state prison plus the low term of three years for the personal use of the gun allegation . . . , consecutive, for a principal term of five years." However, when the trial court was summarizing the sentence, it stated that appellant "is sentenced to a determinate term of five years to run concurrent with the indeterminate term." On the determinate abstract of judgment, the term on count 5 is placed in parentheses, indicating concurrent terms. Because the trial court's intent is unclear, the sentence on count 5 is vacated and the matter remanded for the trial court to clarify its intention.

In addition, the abstracts of judgment contain clerical errors that should be corrected. (See *People v. Scott* (2012) 203 Cal.App.4th 1303, 1324 ["As with other clerical errors, discrepancies between an abstract and the actual judgment as orally pronounced are subject to correction at any time, and should be corrected by a reviewing court when detected on appeal. [Citation.]"].) The determinate abstract incorrectly calculates the total sentence as 12 years, rather than five years. The determinate abstract also erroneously fails to indicate that the five-year gang enhancement on count 3, shooting at an occupied vehicle, was stayed. The indeterminate abstract incorrectly indicates a 10-year sentence on the firearm enhancement on count 1, rather than the 20-year firearm enhancement the trial court imposed.

20

**DISPOSITION**

The judgment is reversed with respect to count 6 and the trial court is directed to dismiss that count. The sentence is vacated in part and the matter remanded for the trial court to clarify whether the sentence imposed on count 5 is to run concurrent to or consecutive with the indeterminate term. We direct the clerk of the superior court to amend the determinate abstract of judgment to reflect that the total sentence is five years, not 12 years, and that the five-year gang enhancement on count 3 is stayed. In addition, the clerk is directed to amend the indeterminate abstract of judgment to reflect that the court imposed a 20-year firearm enhancement on count 1, not a 10-year term. The trial court is directed to forward the amended abstracts of judgment to the Department of Corrections and Rehabilitation. As so modified, the judgment is affirmed in all other respects.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, Acting P. J.


We concur:


MANELLA, J.            COLLINS, J.


21