Filed 6/8/21  P. v. Mays CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B302559 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. BA463973 |
| MARIEL MAYS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark S. Arnold, Judge. Affirmed in part, reversed in part, and remanded with directions.

Lenore De Vita, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Lynne G. McGinnis, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant Mariel Mays was convicted of numerous gang crimes stemming from four confrontations over the course of four months. On appeal, he challenges the sufficiency of the evidence to support his convictions for four counts and two enhancements, contends the prosecutor committed misconduct in closing argument, and argues two of his three felon-in-possession convictions must be stricken because they were all part of the same continuing offense. We agree with defendant that there is no substantial evidence to support two of his convictions for shooting from a motor vehicle.[1] Likewise, the People concede, and we agree, that two of the felon-in-possession convictions must be stricken. We therefore reverse the convictions for counts 3 and 4, vacate defendant's sentence, and remand for resentencing with directions to strike two of the felon-in-possession convictions. In all other respects, we affirm.

## PROCEDURAL BACKGROUND

By amended information dated April 30, 2019, defendant was charged with three counts of attempted murder (Pen. Code,[2] § 664/187, subd. (a); counts 1, 9, 12); three counts of shooting from a motor vehicle (§ 26100, subd. (c); counts 2–4); one count of

---

[1] Because we hold that there is insufficient evidence to support the convictions for counts 3 and 4, we do not address defendant's argument, which the People concede, that he cannot be sentenced for firearm enhancements attached to those counts because they were not alleged in the information. Nor do we address defendant's claim that he lacks the ability to pay court fees because he may raise the issue upon resentencing.

[2] All undesignated statutory references are to the Penal Code.

assault with a semiautomatic firearm (§ 245, subd. (b); count 5); and three counts of felon in possession of a firearm (§ 29800, subd. (a)(1); counts 6, 11, 15).[3] As to counts 1, 2, 9, and 12, the information alleged that defendant personally used a firearm, personally discharged a firearm, and personally discharged a firearm causing great bodily injury (§ 12022.53, subds. (b), (c), (d)); as to count 5, the information alleged defendant personally used a firearm (§ 12022.5, subd. (a)); and as to all counts, the information alleged defendant committed the offense for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). The information also alleged defendant had been convicted of attempted robbery (§ 664/211) in 2012, which was alleged as a strike prior (§§ 667, subd. (d), 1170.12, subd. (b)), a serious-felony prior (§ 667, subd. (a)(1)), and a prison prior (§ 667.5, subd. (b)). Defendant pled not guilty and denied the allegations.

After a bifurcated trial at which he did not testify, the jury found the gang allegation attached to count 5 not true but otherwise found defendant guilty as charged. While the jury deliberated, defendant waived a jury trial on the prior conviction; he later admitted it.

The court imposed an aggregate sentence of 291 years to life. For the determinate sentence, the court selected count 5 (§ 245, subd. (b)) as the base term and imposed 21 years—the mid-term of six years, doubled for the prior strike (§§ 667, subd. (e)(1), 1170.12, subd. (c)(1)), plus four years for the firearm allegation (§ 12022.5), and five years for the serious-felony prior (§ 667, subd. (a)(1)). For each of counts 3 and 4 (§ 26100,

---

[3] Defendant was not held to answer on counts 7, 8, and 14. Counts 10 and 13 were dismissed under section 1385.

subd. (c)), the court imposed a 20-year determinate term—the mid-term of five years, doubled for the prior strike, plus five years for the gang enhancement (§ 186.22, subd. (b)(1)(C)), and five years for the serious-felony prior—followed by an indeterminate term of 25 years to life for an uncharged gun enhancement, to run consecutively to count 5 and each other.

For the indeterminate sentence, the court imposed identical sentences of 60 years to life for counts 1, 9, and 12 (§ 664/187, subd. (a))—a life term with a 15-year minimum parole eligibility period for the gang enhancement (§ 186.22, subd. (b)(5)), doubled to 30 years for the prior strike (§§ 667, subd. (e)(1), 1170.12, subd. (c)(1)), plus 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)), and five years for the serious-felony prior (§ 667, subd. (a)(1))—to run consecutively.

The court stayed the sentences for counts 2, 6, 11, and 15 under section 654.

## FACTUAL BACKGROUND

### 1.    The Gang Milieu

This case involves five gangs with adjacent territories in central Los Angeles that abut the 10 freeway and surround several major north–south streets, including La Cienega Blvd., South La Brea Avenue, Crenshaw Blvd., and Western Avenue.

The westernmost gang, the Playboy Gangster Crips, claim territory encompassed by the 10 freeway to the south, Pico Blvd. to the north, Robertson Blvd. on the west, and La Cienega Blvd. on the east. The northern half of that territory then extends east along 18th Street to approximately Spaulding Avenue. They share this northeastern section with the By Yourself Hustler Crips, with whom they are allied.

4

Heading east, the next large gang territory belongs to the School Yard Crips.[4] Starting at Hauser Blvd. on the west, the School Yard Crips' territory extends along the 10 freeway in the south and Venice Blvd. in the north to Crenshaw Blvd. in the east. Defendant is a member of the School Yard Crips and is heavily tattooed with words and images related to that gang.

At Crenshaw Blvd., the School Yard Crips' territory abuts territory shared by the Black P Stones and the Rollin' 20s, both of which are Bloods gangs. Rollin' 20s territory is bisected by the 10 freeway. North of the freeway, their territorial borders are Crenshaw Blvd. to the west, Wilton Place to the east, Pico Blvd. to the north, and the 10 freeway to the south. The Rollin' 20s share that section of territory with the Black P Stones, one of their gang allies. But south of the freeway, Rollin' 20s territory is much larger, extending south along Crenshaw Blvd. to Jefferson Blvd. in the south, then east all the way to Hoover Street until heading back north to the 10 freeway.

The School Yard Crips do not get along with either of their territorial neighbors—the Playboy Gangster Crips and By Yourself Hustler Crips to their west or the Rollin' 20s Bloods to their east.

**2.      Confrontation at Holiday Liquor Store (Counts 5 & 6)**

Holiday Liquor Store is on West Adams Blvd. and La Brea Avenue. The store is about a block south of School Yard Crips territory.

---

[4] The parties stipulated that the School Yard Crips are a criminal street gang.

Surveillance video from September 16, 2017, shows defendant and a man in a white shirt—identified only as John Doe—inside the store. In the video, defendant removes what appears to be a silver and black semiautomatic firearm from his waistband, racks it, then chases Doe around the store.

### 3.    Shooting at Hot Wings Cafe (Counts 1–4)

Hot Wings Cafe is on Melrose Avenue between La Brea Avenue and N. Sycamore Avenue. Melrose runs east–west, and Hot Wings Cafe is on the north side of the street. Across Melrose to the south is a parking lot. The area isn't claimed by any particular gang.

At around 11:15 p.m. on October 14, 2017, defendant was dining at Hot Wings Cafe with his girlfriend, Shantel Gray.[5] At 11:23 p.m., three cars pulled into the parking lot across the street and parked. Approximately seven people got out of the cars. Among them were Michael James, Jason Greene, Ryan Beverly, and Louis O'Neal, none of whom testified at trial. The group talked for a while then headed across the street to Hot Wings Cafe.

Greene and another man entered then walked over to the table where defendant and Gray were sitting, hugged Gray, and headed to the cash register at the back of the cafe before returning, about 20 seconds later, to the group congregating outside the entrance. Gray had gone to high school with one of the men.

As Greene walked from the front door to the cash register and back to the front door a second time, James entered and

---

[5] Gray testified at trial pursuant to a plea agreement.

headed toward the back of the cafe. When James passed defendant's table, the two men appeared to stare each other down. James belongs to the Playboy Gangster Crips and sports several tattoos related to that gang.

Soon thereafter, Greene headed outside and alerted the rest of the group that someone was in the restaurant. About 30 seconds later, Greene returned and chatted with the security guard inside the doorway as James headed back out. After about a minute of hovering near the doorway, Greene headed to the back of the cafe a third time.

Meanwhile, defendant, upset that Gray didn't introduce him to the men she'd hugged, left his table and went outside; Gray and Greene followed soon after. Outside, defendant and Gray stood to the left of the front door, towards N. Sycamore; he was confronted by the larger group, which stood in a semicircle to the right of the door. As the men argued, Gray heard gang-related comments like "fuck School Yards" and "fuck butts." Defendant lifted his shirt to display a black and silver semiautomatic firearm, asked what the group wanted to do, and started backing up toward N. Sycamore with Gray.

At that point, about half of the group ran across Melrose; O'Neal and Greene ran toward La Brea; and Beverly went back inside Hot Wings. Surveillance video near the parking lot on the south side of Melrose shows James running to the parking lot and firing north across the street. James then jumped in his mother's BMW and drove away.[6] A couple of other cars left in quick succession.

---

[6] The parties stipulated that James is being prosecuted for attempted murder based on this shooting.

Meanwhile, as James was shooting at them, defendant and Gray had headed north down N. Sycamore and turned left into the alley behind Hot Wings Cafe. They went to their car, which was parked at an apartment complex behind the cafe.

Five bullet casings were later recovered between N. Sycamore and the center of the parking lot. Police also recovered a bullet embedded in the Hot Wings back door, which is located in the alley off N. Sycamore.

Soon after the gunshots, as Hot Wings customers fled to the back of the cafe, O'Neal reentered, laughing, followed by Greene. O'Neal joked that the loud noises were caused by firecrackers. Beverly, O'Neal, and Greene stood around laughing for a minute or so, then headed back outside.

By this point, defendant and Gray had reached their car. As they got in, defendant told Gray to duck. She lay down in the back seat and kept her head down below the windows. Defendant drove. Defendant turned left on La Brea and then left on Melrose. He rolled down the window and fired two shots. Police observed bullet impact marks at 7021 Melrose, several doors west of Hot Wings Cafe.

The Hot Wings security guard told the manager to get the keys to the front door, but before he could lock it, O'Neal returned. Beverly, who had been shot in the leg, came in next. When authorities arrived, Beverly was on the ground, scooting backward, holding his leg, and writhing in pain. O'Neal was standing over him.

**4.    Shooting at 27th Street & 7th Avenue (Counts 9 & 11)**

Shortly before 12:30 p.m. on November 15, 2017, a car pulled up outside of the Fame Apartments at 27th Street and 7th Avenue. Approximately seven black men between the ages of

18 and 25 were hanging out outside. The Fame Apartments are known as a Bloods stronghold.

Gray was driving. She had passed the apartments earlier on her way to drop off one of defendant's friends. Defendant, the passenger, told Gray to stop, got out of the car, and shot five or six rounds. He hit Tiyon Cooper,[7] who suffered gunshot wounds to the hand and leg. Defendant ran back to the car and got in. Gray drove off.

Eight .40-caliber casings were recovered from the scene. Most were Smith & Wesson. Some were Winchester.

### 5. Shooting at LaSalle & Adams (Counts 12 & 15)

On December 4, 2017, Paul Larry Nelson, Jr. was walking home from school on La Salle, just south of Adams. He was carrying a Louis Vuitton backpack filled with school papers. Nelson belongs to the Rollin' 20s Bloods.

Defendant told Gray, who was driving a rental car, to follow Nelson.[8] At some point, defendant told Gray to stop the car. Defendant exited from the passenger side, and asked Nelson where he's from. Nelson responded that he's Bloods, but he doesn't bang. Defendant grabbed his waistband and yelled "fuck Twinks." *Twinks* is a derogatory term for members of the Rollin' 20s. Then defendant started shooting. When Nelson heard gunshots, he dropped his backpack and ran. Nelson was shot in the back and the leg.

---

[7] Cooper did not testify at trial.

[8] Defendant's mother sometimes rented cars for him to drive, and on November 25, 2017, she rented a black Chevrolet Malibu from Hertz.

LAPD Officer Luis Aceves was working in the area when he heard three gunshots. As he looked to see where they were coming from, he saw the shooter, later identified as defendant, with a gun, chasing another person; he then heard two more shots. Aceves yelled at defendant to stop, at which point defendant ran to a car and opened the passenger side door. Defendant turned back toward Aceves, still wielding the gun. Aceves fired three rounds but missed. Aceves was using a .45-caliber semiautomatic firearm.

Defendant, now carrying the Louis Vuitton bag, got back into the car; the bag contained school work. The car sped south on La Salle towards Jefferson.

Police recovered nine shell casings from the scene. LAPD Criminalist Brian Reinarz testified that three of the casings came from a .45-caliber firearm, which he determined to be Aceves's gun. The other six casings came from a .40-caliber firearm. All of the .40-caliber casings were fired from the same weapon—a different weapon than the one that fired the .45-caliber rounds. The .40-caliber casings also matched casings recovered from the November 15, 2017 shooting; they were fired from the same firearm.

Reinarz was also asked to look at a projectile recovered from the Hot Wings shooting. He determined that it was a .40-caliber Smith & Wesson. Asked to look at a photo of defendant's gun, recovered from Gray's phone, Reinarz identified the gun as a .40-caliber Smith & Wesson.

Gray's internet search history for the day after the shooting revealed searches for shootings on December 4, 2017, near LaSalle and Halldale. She also searched for Louis Vuitton product codes in an effort to determine whether the bag was real.

On December 16, 2017, defendant's mother returned the Malibu to Hertz.

## DISCUSSION

Defendant contends that the evidence is legally insufficient to support his convictions for counts 1, 3, 4, and 5, the gun allegation attached to count 5, and the gang allegation attached to count 9, and that the prosecutor committed misconduct in closing argument. Defendant also argues, and the People concede, that the court must strike two of the three counts of possession of a firearm by a felon because it is a continuing offense.

### 1. Substantial Evidence

A criminal defendant may not be convicted of any crime or enhancement unless the prosecution proves every fact necessary for conviction beyond a reasonable doubt. (U.S. Const., 5th & 14th Amends.; see Cal. Const., art. I, §§ 7, 15; *In re Winship* (1970) 397 U.S. 358, 364; *People v. Tenner* (1993) 6 Cal.4th 559, 566.) "This cardinal principle of criminal jurisprudence" (*Tenner*, at p. 566) is so fundamental to the American system of justice that criminal defendants are always "afforded protection against jury irrationality or error by the independent review of the sufficiency of the evidence undertaken by the trial and appellate courts." (*United States v. Powell* (1984) 469 U.S. 57, 67.) Here, defendant argues that there is insufficient evidence that he intended to kill Beverly (count 1), that he shot at O'Neal or Greene (counts 3 and 4), that he assaulted John Doe with a semiautomatic firearm—or personally used a firearm in the commission of that offense (count 5), or that he attempted to murder Cooper for the benefit of a criminal street gang (count 9). Although we agree with defendant that the evidence is legally

11

insufficient to support the convictions for counts 3 and 4, we conclude there is substantial evidence to support the convictions for the remaining counts and allegations.

### 1.1.   Standard of Review

In assessing the sufficiency of the evidence to support a conviction, we review the entire record to determine whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60 (*Albillar*).) "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)

Deference is not abdication, however, and substantial evidence is not synonymous with *any* evidence. (*People v. Johnson* (1980) 26 Cal.3d 557, 576–577.) " 'A decision supported by a mere scintilla of evidence need not be affirmed on appeal.' [Citation.] Although substantial evidence may consist of inferences, those inferences must be products of logic and reason and must be based on the evidence." (*In re James R.* (2009) 176 Cal.App.4th 129, 135.) Similarly, we "may not ... ' "go beyond inference and into the realm of speculation in order to find support for a judgment." ' " (*People v. Franklin* (2016) 248 Cal.App.4th 938, 947; *People v. Waidla* (2000) 22 Cal.4th 690, 735 [speculation is not evidence and cannot support a conviction].) Evidence that merely raises a strong suspicion of guilt is

12

insufficient to support a conviction. (*People v. Thompson* (1980) 27 Cal.3d 303, 324.)

### 1.2. There is substantial evidence defendant intended to kill Beverly.

Defendant contends there is insufficient evidence to support his conviction for attempted murder because the prosecution did not prove that he intended to kill Beverly. Although the evidence of express malice is not overwhelming in this case, we conclude that under the required standard of review, a rational jury could have found intent to kill.

" 'The mental state required for [conviction of] attempted murder has long differed from that required for murder itself. Murder does not require intent to kill. Implied malice—a conscious disregard for life—suffices. [Citation.]' [Citation.] In contrast, '[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citations.]" (*People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*).)

"Intent to unlawfully kill and express malice are, in essence, 'one and the same.' [Citation.]" (*Smith, supra*, 37 Cal.4th at p. 739.) "To be guilty of attempted murder of" Beverly, "defendant had to harbor express malice toward that victim. [Citation.] Express malice requires a showing that the assailant ' " 'either desire[s] the result [i.e., death] or know[s], to a substantial certainty, that the result will occur.' [Citation.]" ' [Citations.]" (*Ibid*.)

"The mental state for *attempted* murder is further distinguished from the mental state required for murder in that the doctrine of 'transferred intent' applies to murder but not attempted murder. [Citation.] 'In its classic form, the doctrine of

13

transferred intent applies when the defendant intends to kill one person but mistakenly kills another. The intent to kill the intended target is deemed to transfer to the unintended victim so that the defendant is guilty of murder.' [Citation.] In contrast, the doctrine of transferred intent does not apply to attempted murder: 'To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else.' [Citation.] Whether the defendant acted with specific intent to kill 'must be judged separately as to each alleged victim.' [Citation.]" (*Smith*, *supra*, 37 Cal.4th at pp. 739–740.)

Here, members of a rival gang hugged defendant's girlfriend, Gray. When defendant confronted them outside, they said "fuck School Yards," then shot at defendant as he backed away. Defendant and Gray made it safely back to their car and pulled onto La Brea—but instead of continuing south on La Brea to go home, defendant opted to turn east onto Melrose.

Defendant then fired twice—and the physical evidence showed that the shots were close together. One shot passed through Beverly's leg and hit the wall behind him; the other shot was higher off the ground, near where Beverly's torso would have been. Beverly is a member of the Playboy Gangster Crips and has several large, visible Playboy tattoos. He was part of the group that challenged defendant outside Hot Wings. Later, defendant bragged about the shooting to his brother.

In general, if a jury finds "defendant's use of a lethal weapon with lethal force [is] purposeful, an intent to kill [can] be inferred, even if the act was done without advance consideration and only to eliminate a momentary obstacle or annoyance." (*People v. Arias* (1996) 13 Cal.4th 92, 162.) "Nor is the circumstance that the bullet misses its mark or fails to prove

lethal dispositive—the very act of firing a weapon ' "in a manner that could have inflicted a mortal wound had the bullet been on target" ' is sufficient to support an inference of intent to kill. [Citation.]" (*Smith*, *supra*, 37 Cal.4th at p. 742.) Further, "where motive is shown, such evidence will usually be probative of intent to kill." (*Ibid*.) Taken together, this evidence was sufficient for the jury to infer that defendant acted with express malice when he shot Beverly.

### 1.3. There is no substantial evidence defendant shot at O'Neal or Greene.

Defendant contends there is no substantial evidence to support his convictions for shooting from a motor vehicle at O'Neal (count 3) or Greene (count 4). Having reviewed the entire written record and the exhibits in this matter, we agree.

To convict defendant of shooting from a motor vehicle, the prosecution was required to prove:

- ◦ defendant willfully and maliciously shot a firearm from a motor vehicle;

- ◦ defendant shot the firearm at another person who was not in a motor vehicle; and

- ◦ defendant did not act in self-defense or in defense of someone else.

(§ 26100, subd. (c); see CALCRIM No. 968.)

" '[T]he act of shooting "at" a proscribed target' " is committed either when the defendant shoots directly at the target or " 'when the defendant shoots in such close proximity to the target that he shows a conscious indifference to the probable consequence that one or more bullets will strike the target or persons in or around it. The defendant's conscious indifference to

15

the probability that a shooting will achieve a particular result is inferred from the nature and circumstances of his act.' [Citation.]" (*People v. Hernandez* (2010) 181 Cal.App.4th 1494, 1501.) Here, there is no evidence that defendant shot in "close proximity" to Greene or O'Neal because there is no evidence to establish where Greene and O'Neal were standing in relation to Beverly.[9] Indeed, there is not even any evidence that Greene was still nearby when the shooting happened.

The night of the shooting, Beverly, Greene, and O'Neal arrived at Hot Wings as part of a larger group of six or seven people. Eventually, the group headed outside, where defendant and Gray followed them. Beverly's group stood in a semicircle to the right of the door—west, towards La Brea; defendant and Gray stood to the left—east, towards N. Sycamore. After some tense words, defendant flashed his gun and backed away towards N. Sycamore. At that point, the skinnier guys ran across Melrose to their cars and began firing at defendant and Gray. Beverly returned to Hot Wings while the "bigger guys"—Greene and O'Neal—ran west towards La Brea. After about a minute, O'Neal returned to Hot Wings, followed by Greene. Beverly, Greene, and O'Neal stood around joking for another minute, then headed back outside.

Once they left the cafe, there is no evidence of where they went or whether they stayed together. But just over a minute after they left Hot Wings, more shots were fired. Greene never returned to Hot Wings. Unlike Greene, O'Neal went back to Hot

---

[9] Although the People insist the men "were in a group with Ryan B.," they do not provide any record cites to support this proposition, and our review has revealed none.

Wings after the second shooting—but he did not come back with Beverly. Rather, the video shows him returning alone about 15 seconds after the shooting and at least 16 seconds before Beverly, laughing and joking around. The Hot Wings security guard testified that O'Neal joked that the gunshots were firecrackers; he did not appear to be taking the incident seriously. But O'Neal grew visibly shocked and somber when Beverly walked in with a gunshot wound to the leg.

As discussed, there were bullet holes in the wall at 7021 Melrose, three doors west of Hot Wings Cafe, which support an inference that Beverly was shot in the general area, but there is no evidence about where Greene or O'Neal were when that shooting happened. Greene had left the group at some point after exiting Hot Wings following the first shooting, and, although O'Neal returned, he came back on his own, well before Beverly, with no apparent inkling that Beverly had been hit.

None of this evidence supports a conclusion that either Greene or O'Neal was "in such close proximity" to Beverly that we can infer defendant's "conscious indifference to the probable consequence that one or more bullets" would strike him. (*People v. Hernandez*, *supra*, 181 Cal.App.4th at p. 1501.)

**1.4. There is substantial evidence defendant had the present ability to apply force with a semiautomatic firearm at Holiday Liquor Store.**

To prove defendant committed assault with a semiautomatic firearm (§ 245, subd. (b)), the prosecution was required to establish:

- ◦ defendant did an act with a semiautomatic firearm that by its nature would directly and

17

probably result in the application of force to a person;

- defendant did the act willfully;

- when he acted, defendant was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; and

- when defendant acted, he had the present ability to apply force with a semiautomatic firearm to a person.

(§§ 240, 245, subds. (a)(1)–(3), (b); see CALCRIM No. 875.) Defendant argues there is no substantial evidence he had the present ability to apply force with a semiautomatic firearm because there was insufficient evidence either that he used a semiautomatic firearm or that it was loaded. He also argues there is no substantial evidence he had the present ability to apply force with a semiautomatic firearm to John Doe because he pointed the item at the ground rather than at Doe. We disagree.

### 1.4.1. Semiautomatic Firearm

First, defendant argues there was insufficient evidence that the item he pointed at John Doe was a semiautomatic firearm.

A firearm is any "device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of any explosion or other form of combustion." (§ 16520, subd. (a).) A semiautomatic pistol extracts a fired cartridge and chambers a fresh cartridge with each single pull of the trigger. (§ 17140.) Clearly, threatening someone with a toy gun or candy pistol does not satisfy this element. (*People v. Valdez* (1985) 175 Cal.App.3d

18

103, 110–111.) Nor "do pellet guns or BB guns because, instead of explosion or other combustion, they use the force of air pressure, gas pressure, or spring action to expel a projectile. [Citation.]" (*People v. Monjaras* (2008) 164 Cal.App.4th 1432, 1435 (*Monjaras*).)

Despite this definition's specificity, the prosecution may— and usually does—use circumstantial evidence to prove that an object is a firearm. (*Monjaras*, *supra*, 164 Cal.App.4th at pp. 1435–1436.) "This is so because when faced with what appears to be a gun, displayed with an explicit or implicit threat to use it, few victims have the composure and opportunity to closely examine the object; and in any event, victims often lack expertise to tell whether it is a real firearm or an imitation." (*Id.* at p. 1436.) But the jury may make those inferences.

The video of the Holiday Liquor Store incident, which we have reviewed, plainly shows defendant wielding a silver and black item that appears to be a semiautomatic firearm. (See *Monjaras*, *supra*, 164 Cal.App.4th at pp. 1434, 1436–1437 [finding substantial evidence an object was a firearm where victim saw what looked like the handle of a pistol tucked into defendant's waistband when defendant lifted his shirt to display the item while ordering her to turn over her purse].) The item looks just like the firearm defendant is holding in the photos taken from Gray's phone, which Gray testified was used in the third and fourth shootings. It also fits the appearance of the firearm described by the security guard from Hot Wings, which defendant displayed to rival gang members, then used to shoot Beverly. As such, it was reasonable for the jury to infer the gun in the video was the same semiautomatic firearm defendant had used during the three shootings.

19

### 1.4.2. Loaded Firearm

Second, defendant argues there is insufficient evidence that the gun was loaded.

To satisfy the present-ability element of assault, the defendant must have an actual, not merely apparent, ability to inflict injury. (*People v. Chance* (2008) 44 Cal.4th 1164, 1172–1173, fns. 7, 11 (*Chance*).) Thus, just as assault cannot be committed with a toy gun, it cannot be committed with an unloaded gun unless the gun is used as a bludgeon. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 & fn. 3.) As discussed, there was sufficient evidence from which a reasonable jury could decide defendant wielded a semiautomatic firearm. We conclude the jury could also reasonably infer the gun was loaded.

As with the nature of the object, the prosecution may prove this element using circumstantial evidence. Thus, a "defendant's statements and behavior while making an armed threat against a victim may warrant a jury's finding the weapon was loaded." (*People v. Rodriguez*, *supra*, 20 Cal.4th at p. 12 [defendant's threat, while pointing gun at victim's chin, that he " 'could do to you what I did to them' " supported an inference the gun was loaded].) Here, the Holiday Liquor Store video clearly shows defendant racking the firearm in his hand. The jury could reasonably infer that defendant would not rack the firearm, which advances a cartridge into the chamber for firing, unless the weapon were loaded—and that he certainly would not do so in another gang's territory. (See *id.* at p. 11 [jury could infer defendant gang member would not carry an unloaded gun in an area with prevalent gang violence].)

20

### 1.4.3. Present Ability to Inflict Injury

Third, defendant argues there was insufficient evidence he had the present ability to inflict injury on Doe because he did not point the gun directly at him.

The requirement that a defendant have the present ability to inflict injury "is satisfied when 'a defendant has attained the means and location to strike immediately.' [Citations.] In this context, however, 'immediately' does not mean 'instantaneously.' It simply means that the defendant must have the ability to inflict injury on the present occasion." (*Chance, supra*, 44 Cal.4th at p. 1168; see *id*. at pp. 1171 ["Although temporal and spatial considerations are relevant to a defendant's 'present ability' ... [citation], it is the ability to inflict injury on the present occasion that is determinative, not whether injury will necessarily be the instantaneous result of the defendant's conduct."], 1172 ["when a defendant equips and positions himself to carry out a battery, he has the 'present ability' required ... [citation] if he is capable of inflicting injury on the given occasion, even if some steps remain to be taken"].) Thus, a defendant may commit assault even if he is "several steps away from actually inflicting injury, or if the victim is in a protected position so that injury would not be 'immediate,' in the strictest sense of that term." (*Id*. at p. 1168.)

Here, the evidence is unclear about exactly where defendant was pointing the gun as he followed Doe around the store. Regardless, even if defendant had to take additional steps before he could fire at Doe, there was substantial evidence that he had the present ability to do so. As defendant had already chambered a round, all he had to do to shoot Doe was aim and pull the trigger. Pointing the gun at the floor in Doe's direction was enough to satisfy this element. (See *Chance, supra*, 44

Cal.4th 1164 [defendant had present ability to inflict injury where he would have had to turn around, point his gun at the person standing behind him, and chamber a round before shooting]; *People v. Ranson* (1974) 40 Cal.App.3d 317, 319–321 [substantial evidence of present ability to inflict injury where defendant would have had to remove the clip from the rifle, dislodge a jammed cartridge, reinsert the clip, chamber a round, point the weapon, and pull the trigger], discussed with approval in *Chance*, at pp. 1172–1173.)

Accordingly, we conclude there was substantial evidence to support the conviction for count 5 and its related allegation.

### 1.5. Substantial evidence supports the gang allegation attached to count 9.

Section 186.22, subdivision (b)(1), enhances the sentence of "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members … ." The jury found this enhancement true as to all counts except count 5. Defendant contends the evidence was insufficient to support the finding for count 9—the shooting at 27th Street & 7th Avenue.

Section 186.22, subdivision (b)(1), has two prongs—the gang-related prong and the specific-intent prong—"both of which must be established by the evidence. [Citation.]" (*People v. Franklin*, *supra*, 248 Cal.App.4th at p. 948.) The first prong requires the prosecution to prove that the underlying felony was "gang-related," that is, that the defendant committed the charged offense "for the benefit of, at the direction of, or in association with any criminal street gang." (§ 186.22, subd. (b)(1); *Albillar*, *supra*, 51 Cal.4th at p. 60.) It is undisputed that defendant was a

member of the School Yard Crips, and that the School Yard Crips are a criminal street gang within the meaning of the statute. But "[n]ot every crime committed by gang members is related to a gang." (*Albillar*, at p. 60.) Put another way, the charged offense itself—not just the defendant—must be gang-related. Here, a reasonable jury could have found the shooting was gang-related even though there was no evidence that the victim belonged to a rival gang or that defendant yelled his gang name or flashed gang signs during the shooting.

On November 15, 2017, seven men, aged 18 to 25 were hanging out near some apartments on 27th Street near 7th Avenue. The street is in Rollin' 20s territory, and the apartments are a well-known Rollin' 20s hangout. Rollin' 20s are enemies of the School Yard Crips. Cell phone tracking data showed that defendant and Gray drove east from School Yard Crips territory to Rollin' 20s territory, then immediately returned to where they started. This supported an inference that Gray and defendant went to the area for a specific purpose.

That the purpose was gang-related is supported by expert testimony that committing crimes in a rival gang's territory can enhance the perpetrator's reputation. (*Albillar, supra,* 51 Cal.4th at p. 63 ["Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of ... a[ ] criminal street gang' within the meaning of section 186.22[, subdivision] (b)(1)."]; but see *People v. Ramirez* (2016) 244 Cal.App.4th 800, 819–820 ["purely conclusory and factually unsupported opinions" that the charged crimes are for the benefit of the gang because any violent crime enhances the gang's reputation is insufficient to support a gang

enhancement].) Here, defendant's gang membership "was a major part of his life, as attested to by the many Crips gang tattoos he bore, and the fact that he had already committed a drive-by shooting on behalf of the gang[,]"and would go on to commit another gang-related shooting three weeks later, in the same enemy territory, under similar circumstances. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1172.)

Finally, witnesses' reluctance to testify supported an inference that the shooting was gang-related. One eyewitness to the shooting, who identified Gray as the driver, refused to come to court even under subpoena. She appeared only after being arrested and taken into custody. This behavior supported an inference that she was afraid of retaliation. Likewise, a second eyewitness denied talking to law enforcement until he was confronted with a recording of his prior statement. He testified that snitching can lead to physical violence.

The second prong of the enhancement "requires that a defendant commit the gang-related felony 'with the specific intent to promote, further, or assist in any criminal conduct by gang members.' " (*Albillar*, *supra*, 51 Cal.4th at p. 64; § 186.22, subd. (b)(1).) Of course, "[r]arely is the perpetrator's intent proven by direct evidence; usually it must be inferred from the facts and circumstances surrounding the case. [Citation.]" (*People v. Perez* (2017) 18 Cal.App.5th 598, 607.) The circumstances here support such an inference. Although defendant did not flash gang signs, announce his gang, or commit the crime with other gang members, his commission of a drive-by shooting in enemy territory—a prototypical gang crime (*People v. Livingston*, *supra*, 53 Cal.4th at p. 1172)—when combined with the other evidence

discussed above, allowed the jury to conclude that he did so to promote his gang.

## 2. Prosecutorial Misconduct

Defendant argues that the prosecutor unfairly commented on the evidence during closing argument by decoding the gang slang used in defendant's phone call with his brother. In particular, defendant objects to the prosecutor's definition of the word *cracking* as meaning shooting. Acknowledging that the issue has been forfeited by his failure to object below, he argues that defense counsel's failure to object amounted to constitutionally inadequate representation. We disagree.

### 2.1. Proceedings Below

During Gray's testimony, the prosecution introduced two phone conversations between defendant, Gray, and defendant's brother Montiel while Montiel was in prison. In the first phone call, made three days after the Hot Wings shooting, defendant bragged about the crime. He used gang slang to describe his conduct.

During closing argument, the prosecutor argued:

> If you recall, the detectives pulled prison calls. Not—the defendant was not in prison; the defendant was calling—or got called by his brother who is currently in state prison. Those calls are all recorded. During those calls, the defendant is talking to his brother and it's very— I'll admit to you, it's very difficult to understand and you may have to listen to it closely, but he admits to the shooting at the Hot Wings Cafe and exactly what happened. He says that they

25

cracked on him and he cracked back. "Cracking" being shooting.

But then what he does—and this is corroboration of what [Gray] is telling you because [Gray] tells you they went back around to the Hot Wings Cafe. The last part he says—Male 2 is the defendant—"Yeah, I pull—I pull off, bro. I pull off. I pull up to the front, boom, boom, boom, wham, wham, wham, and I got off."

So what he's talking about is they're pulling out. They're getting out of there. He pulls to the front of the Hot Wings Cafe and starts shooting. And he described both the shooting before, when they cracked on him, and when he comes back and cracks on them. And it's obvious he's talking about the Hot Wings Cafe thing because they actually tell you the Hot Wings Cafe and the one on Melrose during the call. What's more, this call was made days after the shooting at the Hot Wings in October.

Defense counsel did not object.

## 2.2. Defense counsel did not provide constitutionally defective representation.

" 'To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument. [Citation.]' [Citation.] A failure to timely object and request an admonition will be excused if doing either would have been futile, or if an admonition would not have cured

26

the harm." (*People v. Linton* (2013) 56 Cal.4th 1146, 1205.) Here, defendant concedes he failed to object to the prosecutor's misstatement and to request an admonition. As such, the issue is forfeited. Defendant contends, however, that defense counsel's failure to object constituted ineffective assistance of counsel.

Under either the federal or state Constitution, the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland v. Washington* (1984) 466 U.S. 668, 686 (*Strickland*).) To establish ineffective assistance of counsel, defendant must satisfy two requirements. (*Id.* at pp. 690–692.)

First, he must show his attorney's conduct was "outside the wide range of professionally competent assistance." (*Strickland*, *supra*, 466 U.S. at p. 690.) Then, he must demonstrate that the deficient performance was prejudicial—i.e., there is a reasonable probability that but for counsel's failings, the result of the proceeding would have been different. (*Id.* at p. 694.) "It is not sufficient to show the alleged errors may have had some conceivable effect on the trial's outcome; the defendant must demonstrate a 'reasonable probability' that absent the errors the result would have been different." (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008.)

Claims of ineffectiveness must usually be "raised in a petition for writ of habeas corpus [citation], where relevant facts and circumstances not reflected in the record on appeal, such as counsel's reasons for pursuing or not pursuing a particular trial strategy, can be brought to light to inform" the inquiry. (*People v. Snow* (2003) 30 Cal.4th 43, 111.) "There may be cases in which

27

trial counsel's ineffectiveness is so apparent from the record that appellate counsel will consider it advisable to raise the issue on direct appeal. There may be instances, too, when obvious deficiencies in representation will be addressed by an appellate court sua sponte." (*Massaro v. United States* (2003) 538 U.S. 500, 508.) But those cases are rare.

Typically, if "the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation. [Citations.]" (*People v. Scott* (1997) 15 Cal.4th 1188, 1212.) These arguments should instead be raised on collateral review. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267.)

Although he acknowledges that prosecutors enjoy "wide latitude in commenting on the evidence, including urging the jury to make reasonable inference therefrom," defendant argues that the prosecutor testified as an unsworn expert by defining *cracking* for the jury. (*People v. Ellison* (2011) 196 Cal.App.4th 1342, 1353.) To be sure, no witness had defined *cracking*, but the witness testimony and the call itself provided enough context for the jury to figure out the meaning of the term on its own.

In particular, defendant used the word *cracking* in the call in close proximity both to various gunshot noises and to the word *blower*, which Gray defined as a gun. For example, defendant said, "I'm like, clack, clack and then I get low (inaudible) then I get low and all that (inaudible). His tail come outside. I'm just—I'm like, make a move. Make a move. I (inaudible) he running to the car. I (inaudible) to the car, boom. The little nigga come back and get cracking on me. Bak, bak, bak." Similarly, later in the

call, defendant said, "Boom, but he cracked on me. I cracked back. I cracked back (inaudible) boom, boom, boom." In context, the jury could reasonably infer that the sound effects "clack, clack," "bak, bak," and "boom, boom" are gunshots, and that *cracking* is another word for shooting. The prosecutor did not commit misconduct by inviting the jury to make such an inference.

"Defense counsel does not render ineffective assistance by declining to raise meritless objections." (*People v. Ochoa* (2011) 191 Cal.App.4th 664, 674, fn. 8.) Here, defense counsel may have concluded that any objection would have been futile because the prosecutor's remarks invited the jury to draw a reasonable inference from the evidence. Certainly, his failure to object was not obviously deficient.

### 3. Two of the three felon-in-possession convictions must be stricken.

Defendant contends that two of his three convictions for felon in possession of a firearm (§ 29800, subd. (a)(1)) should be stricken because the prosecution did not prove that he possessed three separate weapons or that he relinquished possession of the firearm between the three shootings. The People properly concede the point, and we agree. (*People v. Mason* (2014) 232 Cal.App.4th 355 [felon in possession is a continuing offense].) We therefore order the court to strike two of the three convictions upon resentencing.

### 4. The sentencing minute order and abstract of judgment are inaccurate.

In a criminal case, the oral pronouncement of a sentence constitutes the judgment. (*People v. Mesa* (1975) 14 Cal.3d 466,

29

471.) "An abstract of judgment is not the judgment of conviction; it does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize." (*People v. Mitchell* (2001) 26 Cal.4th 181, 185; *Mesa*, at p. 471 [to the extent a minute order diverges from the sentencing proceedings it purports to memorialize, it is presumed to be the product of clerical error].) Accordingly, courts may correct clerical errors at any time, and appellate courts may order correction of an abstract of judgment that does not accurately reflect the oral pronouncement of sentence. (*Mitchell*, at pp. 185–188.)

In this case, the reporter's transcript of the August 27, 2019 sentencing hearing indicates that the court imposed $300 in conviction assessments (Gov. Code, § 70373) and $400 in operations assessments (§ 1465.8).[10] But the minute order for that date and the abstract of judgment based on that minute order include not only those fees but *also* a $300 restitution fine (§ 1202.4, subd. (b)) and a $300 parole revocation restitution fine (§ 1202.45)—neither of which the court imposed.

Because the sentencing minute order and abstract of judgment list fines the court did not impose, they must be corrected to remove them. (See *People v. Mitchell*, *supra*, 26 Cal.4th at pp. 185–188 [discussing the importance of correcting inaccurate abstracts of judgment on appeal].) We order the court to do so upon remand.

---

[10] Because we are remanding this matter for resentencing, we do not address defendant's argument that he lacks the ability to pay these fees under *People v. Dueñas* (2019) 30 Cal.App.5th 1157. He may raise that issue upon resentencing.

## DISPOSITION

The sentence is vacated; counts 3 and 4 are reversed; and the matter is remanded for resentencing. Upon remand, the court shall enter a verdict of not guilty for counts 3 and 4, strike two of the three convictions of felon in possession of a firearm (§ 29800, subd. (a)(1)), and resentence defendant accordingly. In all other respects, we affirm.

When resentencing defendant, the court should be mindful that the five-year serious-felony prior (§ 667, subd. (a)(1)) may be imposed only once for the determinate sentence. (See *People v. Sasser* (2015) 61 Cal.4th 1.) The court is directed to correct the prior sentencing minute order and abstract of judgment as noted in section 4 of the discussion. The clerk of this court is directed to send a copy of this opinion and the remittitur to the Department of Corrections and Rehabilitation. (Cal. Rules of Court, rule 8.272(d)(2).)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.                                    KALRA, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.